## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
|  | ) |
| v. | ) |
|  | ) Case No. 1:16-mj-63-MSN |
|  | ) |
| NISREEN ASSAD IBRAHIM BAHAR, | ) |
| a/k/a "Umm Sayyaf," | ) |
| **Defendant.** | ) |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO ENFORCE THE MOVANTS' RIGHTS UNDER THE CRIME VICTIMS' RIGHTS ACT

## TABLE OF CONTENTS

**Page**

STATEMENT OF FACTS ............................................................................................... 2

I.   ISIL's Crimes Against The Yazidis ...................................................................... 2

    A.   ISIL's Plan To Destroy The Yazidis ............................................................ 3

    B.   Enslavement And Sexual Abuse Of Yazidi Women And Girls .................... 4

II.  The Defendant Enslaved Women And Girls At The Sayyaf House ...................... 6

    A.   Mary Roe .................................................................................................... 7

    B.   Mary Roe II And Mary Roe III ................................................................... 8

    C.   Nasima Avdo Saleh And Inas Alias Hussein ............................................... 9

    D.   Mary Roe VI ............................................................................................. 10

III. The Defendant's Arrest And The Movants' Attempts To Exercise Their CVRA Rights ... 12

ARGUMENT ............................................................................................................... 17

IV.  The Movants Are Victims Under The CVRA ..................................................... 17

    A.   The CVRA Defines "Crime Victim" Broadly ........................................... 17

    B.   The Movants Were Directly And Proximately Harmed By The Alleged Conspiracy To Provide Material Support To ISIL And Are Crime Victims ... 19

        i.   The Defendant's Conspiracy To Provide Material Support To A Foreign Terrorist Organization ................................................................................ 19

        ii.  The Movants Suffered Severe Physical And Emotional Harm As A Direct And Proximate Result Of The Defendant's Acts In Furtherance Of The Alleged Conspiracy ............................................................................................... 20

V.   The Government Has Prevented The Movants From Exercising Their Rights As Crime Victims Under The CVRA ....................................................................... 22

    A.   As Crime Victims, The Movants Are Entitled To Certain Rights Under The CVRA 22

    B.   The United States Government Has Failed To Provide The Movants With The Information Necessary To Effectuate Their Rights ..................................... 23

CONCLUSION ............................................................................................................ 27

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Antrobus,*
519 F.3d 1123 (10th Cir. 2008) .....................................................................20

*In re Dean,*
527 F.3d 391 (5th Cir. 2008) .........................................................................23

*Doe 1 v. United States,*
359 F. Supp. 3d 1201 (S.D. Fla. 2019) ..........................................................26

*Doe v. United States,*
950 F. Supp. 2d 1262 (S.D. Fla. 2013) ..........................................................26

*Does v. United States,*
817 F. Supp. 2d 1337 (S.D. Fla. 2011) ..........................................................25

*In re Henriquez,*
2015 WL 10692637 (D.C. Cir. Oct. 16, 2015) ...................................18, 19, 23

*In re McNulty,*
597 F.3d 344 (6th Cir. 2010) .................................................................18, 20, 21

*In re Mikhel,*
453 F.3d 1137 (9th Cir. 2006) .......................................................................22

*In re Stewart,*
552 F.3d 1285 (11th Cir. 2009) .....................................................................18

*United States v. Alexanda Amon Kotey and El Shafee Elsheikh,*
No. 1:20-cr-000239-TSE (E.D. Va. 2020).......................................................25

*United States v. Credit Suisse AG,*
2014 WL 5026739 (E.D. Va. Sept. 29, 2014)..................................................20

*United States v. Cummings,*
281 F.3d 1046 (9th Cir. 2002) .......................................................................22

*United States v. Giraldo-Serna,*
118 F. Supp. 3d 377 (D.D.C. 2015)................................................................18

*United States v. Giraldo-Serna,*
No. 1:04-cr-00114-RBW, Order, Dkt. 541 (D.D.C. Mar. 14, 2016) ...............18

# TABLE OF AUTHORITIES
(continued)

Page(s)

*United States v. Goba,*
220 F. Supp. 2d 182 (W.D.N.Y. 2002) ..................................................................19

*United States v. Heaton,*
458 F. Supp. 2d 1273 (D. Utah 2006) ..................................................................26

*United States v. Hunter,*
2008 WL 53125 (D. Utah June 3, 2008) ..............................................................18

*United States v. Ingrassia,*
2005 WL 2875220 (E.D.N.Y. 2005) ....................................................................25

*United States v. Moussaoui,*
483 F.3d 220 (4th Cir. 2007) ..............................................................................17

*United States v. Warwick,*
2011 WL 4527285 (D. Md. Sept. 26, 2011) ........................................................20

## STATUTES

18 U.S.C. § 2339A .................................................................................................19

18 U.S.C. § 2339B(a)(1) .......................................................................................19

18 U.S.C. § 3663(a)(2) .........................................................................................22

18 U.S.C. § 3771 .......................................................................................1, 2, 23, 26

18 U.S.C. § 3771(a)(1) .................................................................................1, 23, 26

18 U.S.C. § 3771(a)(2) .................................................................................1, 23, 26

18 U.S.C. § 3771(a)(5) ...............................................................................22, 26, 27

18 U.S.C. § 3771(a)(6) .................................................................................1, 23, 27

18 U.S.C. § 3771(a)(7) .................................................................................1, 23, 27

18 U.S.C. § 3771(a)(8) .................................................................................1, 23, 27

18 U.S.C. § 3771(c)(1) .........................................................................................23

18 U.S.C. § 3771(d)(3) .....................................................................................19, 23

18 U.S.C. § 3771(e) .............................................................................................18

ii

# TABLE OF AUTHORITIES
## (continued)

Page(s)

18 U.S.C. § 3771(e)(2)(A) ...................................................................................2, 22

18 U.S.C. § 3771(e)(2)(B) ........................................................................................2

**OTHER AUTHORITIES**

108 CONG. REC. S4260 (daily ed. Apr. 22, 2004) ....................................................18

Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9 1948, art. II(a) 3

U.S. Dep't of Justice, *Wife of Dead ISIL Leader Charged in Death of Kayla Jean Mueller*, Feb. 8, 2016, *available at* https://www.justice.gov/usao-edva/pr/wife-dead-isil-leader-charged-death-kayla-jean-mue ......................................................................................13

ISIL, Dep't of Fatwas & Research, Fatwa No. 64, Jan. 29, 2015 .............................5

ISIL, Dep't of Fatwas & Research, *Questions and Answers on Taking Captives and Slaves*, Muharram 1436 (Oct./Nov. 2014) (partial translation *available at* https://www.hrw.org//2015///isis-rules) ................................................................5

ISIL, Media Office, *Conversion of hundreds of Yazidi men to Islam*, Aug. 21 2014, *available at* https://www.youtube.com/watch?v=MTUROU ............................................................4

*Islamic State ruling aims to settle who can have sex with female slaves*, Dec. 29, 2015, http://www.reuters.com/article/us-usa-islamic-state-sexslaves-exclusive-idUSKBN0UC0AO20151230 ....................................................................................5

Public hearings in the Taha Al.-J. genocide case on 29 May and 9, 15 June 2020 before State Security Chamber of the Higher Regional Court of Frankfurt, Germany, file number: 3 StE 1/20-4 ......................................................................................................................3

S. Exec. Doc. O, 81-1 (1949), 78 U.N.T.S. 277 ........................................................3

U.N. Human Rights Council, *Report of the Office of the United Nations High Commissioner for Human Rights on the human rights situation in Iraq in the light of abuses committed by the so-called Islamic State and the Levant and associated groups*, U.N. DOC. A/HRC/28/18, Mar. 27, 2015 ................................................................................................................4

U.N. Human Rights Council, *"They Came to Destroy": ISIS Crimes Against the Yazidis*, U.N. DOC. A/HRC/32/CRP.2, June 15, 2016 ................................................................3

U.N. Human Rights Council, *They have erased the dreams of my children: children's rights in the Syrian Arab Republic*, Jan. 13, 2020 ..........................................................5

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

U.S. Dep't of Justice, Attorney General Guidelines for Victim and Witness Assistance, 2011 ed. (rev. May 2012) ..................................................................................18, 23

U.S. Dep't of Treasury, Office of Foreign Assets Control, Sanctions Actions Pursuant to Executive Orders 13224, *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl0188.aspx........................................................................................7

U.S. Department of State, Secretary of State John Kerry, *Remarks on Daesh and Genocide*, Mar. 17, 2016, at 1, *available at* https://20092017-.state.gov/secretary/remarks//03/.htm................3

United Nations, *A Call for Accountability and Protection: Yezidi Survivors of Atrocities Committed by ISIL*, Aug. 2016 ......................................................................................4

United Nations, *Report on the Protection of Civilians in the Armed Conflict in Iraq: 6 July to 10 September 2014*, Sept. 26, 2014..................................................................................4

U.N. Security Council, *United Nations Special Report of the Office of the Special Representative of the Secretary-General on Sexual Violence in Conflict*, U.N. DOC. S/2016/1090, Dec. 21, 2016.................................................................................................................5

**RULES**

FED. R. CRIM. P. § 1(b)(12)....................................................................................................18

FED. R. CRIM. P. §§ 32(i)(4)(B) ..............................................................................................2

FED. R. CRIM. P. § 60(a)(3) ...................................................................................................2

Defendant Nisreen Assad Ibrahim Bahar (also known as "Umm Sayyaf") and her husband, a senior leader in the Islamic State of Iraq and the Levant ("ISIL"), enslaved women and girls. They subjected their victims to sexual violence, severe beatings, and other forms of torture. After the Government charged the Defendant in 2016 for her role in these horrific crimes—charging her with knowingly conspiring to provide material support to ISIL—five of her victims tried, unsuccessfully, to exercise their rights to notice and information about the status of the case under the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771.

Four years later, these victims are still in the dark about the Defendant's current location, the basis for her detention, the status of her detention, the likelihood and timing of her possible release, and the reason for the Government's unwillingness to seek her transfer to the United States to stand trial. Notwithstanding the victims' repeated requests, the Government has *never* provided them with this information. In fact, it has not given the victims any update about the Defendant's case since 2019. Thus, the Government (in particular the Department of Justice) has denied these victims access to information necessary to determine whether, and to what extent, their CVRA rights have been violated. Those rights include the right to be reasonably protected from the accused; to reasonable, accurate, and timely notice of any public court or parole proceeding involving the charged offense; to notice about the accused's release or escape; to full and timely restitution as provided in law; to proceedings free from unreasonable delay; and to be treated with fairness and with respect for their dignity and privacy. *See* 18 U.S.C. § 3771(a)(1)–(2), (6)–(8).

The victims—Movants Mary Roe, Mary Roe II, Mary Roe III, Nasima Avdo Saleh, and Mary Roe VI (collectively, the "Movants")—are therefore forced to bring this motion respectfully requesting that the Court enter an order: (1) recognizing them as "crime victims" under the CVRA; and (2) requiring the Government to immediately give the victims all information necessary to

1

effectuate their rights under the CVRA. Given that the Movants were held captive[1] by the Defendant as part of ISIL's practice of enslaving Yazidi women and children, it cannot be disputed that the Defendant's crimes caused the Movants severe and continuing harm entitling them to "crime victim" status.

As victims of the Defendant's crimes, the Movants are entitled to the rights and protections afforded by the CVRA. *See* 18 U.S.C. § 3771; *see also* FED. R. CRIM. P. §§ 32(i)(4)(B) & 60(a)(3). The Court should grant this motion and require the Government to honor its obligations under the law.

## STATEMENT OF FACTS

### I.    ISIL'S CRIMES AGAINST THE YAZIDIS

ISIL is a terrorist organization that has committed systematic human rights abuses, including mass executions of innocent civilians, persecution of individuals from ethnic and religious communities on the basis of their identity, kidnapping innocent civilians, killing and maiming children, and systemic rape and sexual violence against women and girls.[2]

At the time of the Defendant's crimes, ISIL was engaged in a violent campaign throughout the Middle East and North Africa to forcibly acquire land to establish an Islamic Caliphate.[3] ISIL

---

[1]    Nasima Avdo Saleh appears here both assuming her minor daughter's (Inas Alias Hussein) rights as a crime victim and in her own capacity as a victim under the CVRA because of the emotional injuries she has suffered as a result of her daughter's captivity. *See* 18 U.S.C. § 3771(e)(2)(B) & (e)(2)(A).

[2]    *See* ECF No. 4, Affidavit of William H. Heaney in Support of Criminal Complaint and Arrest Warrant ("Heaney Aff.") ¶ 5. In 2004, the United States designated ISIL's predecessor al-Qaida in Iraq a Foreign Terrorist Organization, and in 2014 amended the designation to add the alias ISIL as its primary name. *See id.* ¶ 4.

[3]    *See* Heaney Aff. ¶¶ 4, 6.

was highly organized, exercising military authority and implementing State-like bureaucratic governance structures in the territories it controlled.[4]

### A.    ISIL's Plan To Destroy The Yazidis

According to the United States Government, ISIL "is genocidal by self-proclamation, by ideology, and by actions."[5] ISIL's vision and policies include singling out non-Sunni religious minorities for abuse. ISIL planned to annihilate the Yazidis in particular, viewing their destruction as a religious imperative.[6] The United States and the United Nations both confirmed that ISIL has committed genocide against the Yazidis.[7]

The Yazidis are a Kurdish-speaking ethnic and religious minority.[8] Before the genocide, the Yazidis primarily lived in Sinjar, an area consisting of hundreds of villages around the base of Mount Sinjar in the border region of northern Iraq and Syria.[9] In August 2014, ISIL launched a

---

[4]  *See* ISIL, Al-Furqan Media Outlet, Video on '*Structure of the Caliphate*', extracts reprinted at https://www.aymennjawad.org/2016/07/observations-on-the-new-islamic-state-video.    Until his death on October 27, 2019, Abu Bakr al-Baghdadi, the group's self-proclaimed caliph, sat at the head of ISIL's political structure. Heaney Aff. ¶¶ 5–6.

[5]  U.S. Department of State, Secretary of State John Kerry, *Remarks on Daesh and Genocide*, Mar. 17, 2016, at 1, *available at* https://2009-2017.state.gov/secretary/remarks/2016/03/254782.htm [hereinafter "Secretary Kerry Remarks"] (also finding that genocide was committed against other religious groups).

[6]  *See, e.g.*, U.N. Human Rights Council, *"They Came to Destroy": ISIS Crimes Against the Yazidis*, U.N. DOC. A/HRC/32/CRP.2, June 15, 2016, ¶¶ 33, 55, 82, 153, 155 [hereinafter "U.N. COI Report"]; ISIL, *The Revival of Slavery Before the Hour*, DABIQ, Issue 4, 14–17, at 14 (Sept./Oct. 2014), *available at* https://clarionproject.org/docs/islamic-state-isis-magazine-Issue-4-the-failed-crusade.pdf [hereinafter "Dabiq Issue 4"]. *See also* ISIL, *The Law of Allah or the Laws of Men*, DABIQ, Issue 10, 50–64 (2015).

[7]  Secretary Kerry Remarks; U.N. COI Report ¶¶ 111, 144, 148, 163–65; *see also* Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9 1948, art. II(a) (killing members of the group), (d) (imposing measures intended to prevent births within the group), (e) (forcibly transferring children of the group to another group), S. Exec. Doc. O, 81-1 (1949), 78 U.N.T.S. 277; Public hearings in the Taha Al.-J. genocide case on 29 May and 9, 15 June 2020 before State Security Chamber of the Higher Regional Court of Frankfurt, Germany, file number: 3 StE 1/20-4 (describing testimony of expert witnesses Dr. Steinberg and Dr. Blume that ISIL's goal was to eradicate the Yazidi population).

[8]  U.N. COI Report ¶¶ 100–05.

[9]  *Id.* ¶ 17.

3

premeditated genocidal campaign to invade Sinjar and destroy the Yazidi population by enslaving the women and children and killing or converting the men.[10] Hundreds of Yazidi men and older women were killed and tens of thousands were trapped on Mount Sinjar without access to food or water.[11] As described further below, ISIL captured and enslaved thousands of Yazidi women and girls—selling them at auctions, raping them at will, and destroying the communities in which they had lived for generations.[12] These victims include the Movants.

**B. Enslavement And Sexual Abuse Of Yazidi Women And Girls**

ISIL captured Yazidi women and girls and made them available to its fighters for sexual abuse on a massive scale. Unmarried women and girls over the age of nine were taken to processing centers, where they were registered and photographed.[13] ISIL fighters then selected which women and girls they wished to purchase as slaves.[14]

Many Yazidi women and girls were sold in physical markets (*souk sabaya*) which were organized and operated by a central Committee for Buying and Selling of Slaves,[15] while others

---

[10] *See id.* ¶¶ 23, 29–31, 155, 163–65; ISIL, Media Office, *Conversion of hundreds of Yazidi men to Islam*, Aug. 21 2014, *available at* https://www.youtube.com/watch?v=CCwK3MTUROU; *see also* United Nations, *Report on the Protection of Civilians in the Armed Conflict in Iraq: 6 July to 10 September 2014*, Sept. 26, 2014, at 12–13; United Nations, *A Call for Accountability and Protection: Yezidi Survivors of Atrocities Committed by ISIL*, Aug. 2016, at 8, 12.

[11] Secretary Kerry Remarks at 2; *see also* U.N. COI Report ¶¶ 33, 37–41, 106–11, 144, 147–48; U.N. Human Rights Council, *Report of the Office of the United Nations High Commissioner for Human Rights on the human rights situation in Iraq in the light of abuses committed by the so-called Islamic State and the Levant and associated groups*, U.N. DOC. A/HRC/28/18, Mar. 27, 2015, ¶¶ 35–43.

[12] Secretary Kerry Remarks at 2; U.N. COI Report ¶¶ 48, 55, 64–66, 72, 74.

[13] U.N. COI Report ¶¶ 44–46.

[14] *Id.* ¶¶ 52, 55; *see also* ISIL, *Notice on buying sex slaves*, Homs province, June 15, 2015, reprinted in Aymenn Jawad Al-Tamimi, *Archive of Islamic State Administrative Documents (cont.)*, Jan. 11, 2016, Specimen 13Y, *available at* https://www.aymennjawad.org/2016/01/archive-of-islamic-state-administrative-documents-1.

[15] U.N. COI Report ¶ 58.

4

were sold on online messaging applications such as "Telegram."[16] The price for a Yazidi female started at U.S. $20 and depended on factors such as virginity, age, and beauty.[17] Once a Yazidi woman or girl was purchased, the purchasing ISIL member could resell, gift, or will her to other ISIL members.[18]

While in ISIL captivity, ISIL members subjected Yazidi women and girls to brutal sexual violence, beatings, verbal abuse, and forced domestic labor. They denied victims access to adequate food and medicine.[19] They met victims' attempts to resist with the threat or perpetration of gang rape and beatings.[20]

ISIL's publicly declared ideology not only expressly permitted sexual abuse of Yazidi women and girls, but explicitly encouraged and regulated it.[21] For example, ISIL published a

---

[16] *See, e.g.*, U.N. Security Council, *United Nations Special Report of the Office of the Special Representative of the Secretary-General on Sexual Violence in Conflict*, U.N. DOC. S/2016/1090, Dec. 21, 2016 at 7 and Annex 3; *see also* FIDH and Kinyat, *Iraq – Sexual and gender-based crimes against the Yazidi Community: the role of ISIL foreign fighters*, Dec. 2018 at 23–26, *available at* https://www.fidh.org/IMG/pdf/irak723angweb.pdf.

[17] *See* U.N. Security Council, *United Nations Special Report of the Office of the Special Representative of the Secretary-General on Sexual Violence in Conflict*, U.N. DOC. S/2016/1090, Dec. 21, 2016 at 7 and Annex 3; *see also* FIDH and Kinyat, *Iraq – Sexual and gender-based crimes against the Yazidi Community: the role of ISIL foreign fighters*, Dec. 2018 at 25, *available at* https://www.fidh.org/IMG/pdf/irak723angweb.pdf.

[18] U.N. COI Report ¶¶ 62, 76; *see also* Heaney Aff. ¶ 10.

[19] U.N. COI Report ¶¶ 51, 64–66, 72–74; Heaney Aff. ¶ 10; *see also* U.N. Human Rights Council, *They have erased the dreams of my children: children's rights in the Syrian Arab Republic*, Jan. 13, 2020, at 16.

[20] U.N. COI Report ¶¶ 65–66, 119; *see also* Heaney Aff. ¶ 12.

[21] *See* U.N. COI Report ¶¶ 54, 124. For example, fighters could rape virgins immediately after taking possession of them; fighters had to wait to rape non-virgins until the women menstruated; fathers and sons could not have sex with the same slave; and the same fighter could not have sex with both a mother and a daughter. *See, e.g.*, ISIL, Dep't of Fatwas & Research, Fatwa No. 64, Jan. 29, 2015, reprinted in REUTERS, *Islamic State ruling aims to settle who can have sex with female slaves*, Dec. 29, 2015, http://www.reuters.com/article/us-usa-islamic-state-sexslaves-exclusive-idUSKBN0UC0AO20151230; ISIL, Dep't of Fatwas & Research, *Questions and Answers on Taking Captives and Slaves*, Muharram 1436 (Oct./Nov. 2014) (partial translation *available at* https://www.hrw.org/news/2015/09/05/slavery-isis-rules) [hereinafter "Q&A on Taking Captives & Slaves"].

"question and answer" pamphlet explaining the underlying policy according to which Yazidi women and girls were "merely property" and the applicable rules for treating them as such.[22]

ISIL's sexual enslavement of Yazidi women and girls constitutes "serious bodily and mental harm" within the meaning of Article II of the Genocide Convention and has been recognized by the United Nations as a clear genocidal "step in the process of destruction" of the Yazidis.[23]

## II.   THE DEFENDANT ENSLAVED WOMEN AND GIRLS AT THE SAYYAF HOUSE

Between September 2014 and May 2015, the Defendant and her husband, Abu Sayyaf, a senior ISIL leader, maintained a brothel of *sabaya* (slaves).[24]  The Defendant admits that the captives in her home were held by her and her husband on behalf of ISIL.[25]  She further admits that she was responsible for maintaining custody of the slaves, and that she had sole responsibility for imprisoning them when her husband was away.[26]  The women enslaved by the Defendant and her husband included four of the Movants, Movant Ms. Saleh's daughter (Inas Alias Hussein), other Yazidi girls, and Kayla Mueller (a U.S. citizen).[27]  The enslaved women were made available to ISIL fighters visiting the house, including Abu Bakr al-Baghdadi, the self-proclaimed caliph, who sexually abused Kayla Mueller with the Defendant's knowledge at the Defendant's home.[28]

---

[22]   *Q&A on Taking Captives & Slaves; see also* U.N. COI Report ¶ 54.

[23]   U.N. COI Report ¶¶ 122–23, 129–32, 139.

[24]   *See* Heaney Aff. ¶¶ 9–13, 16.

[25]   *Id.* ¶¶ 10, 12, 16.  The Defendant has also admitted to U.S. authorities that she admired ISIL, chose to marry her husband while he was a member of ISIL, and sometimes accompanied him on ISIL-related travel. *Id.* ¶¶ 15, 19.  She admits that her residence was used to store firearms and large sums of illegally acquired money for use by ISIL fighters. *Id.* ¶¶ 20, 22.

[26]   *Id.* ¶ 16.

[27]   *Id.* ¶¶ 10, 16.

[28]   *Id.* ¶¶ 9–10.

6

## A.    Mary Roe

Mary Roe is an Iraqi national and a member of the Yazidi faith.[29]  She was 17 years old when she was abducted by ISIL fighters on August 3, 2014.[30]  For the next nine months, she was enslaved, subjected to physical and sexual violence, and trafficked through ISIL detention centers in Iraq.[31]  At one point during her captivity, Mary Roe lost hope that she would ever be free again and attempted to commit suicide.[32]

ISIL initially "gifted" Mary Roe as a sex slave to Haji Hamad, a senior ISIL *emir*.[33]  Hamad enslaved and repeatedly raped Mary Roe for several months.[34]  Eventually, Hamad took Mary Roe to the Defendant's husband, Abu Sayyaf, and exchanged her for another Yazidi slave, Inas Alias Hussein (Movant Ms. Saleh's daughter).[35]  The Defendant denigrated Mary Roe as a sub-human devil-worshipper, in accordance with ISIL's ideology.  She told Mary Roe that she would make her life a living hell and make Mary Roe wish she were dead.[36]

At the Sayyaf house, Mary Roe was usually kept handcuffed or with her hands bound in a small locked room.[37]  The Defendant forced Mary Roe to perform domestic labor.[38]  The Defendant would direct her husband to beat Mary Roe, or lie to her husband about Mary Roe's

---

[29]  *See* Declaration of Anna Bonini in Support of Motion to Enforce Movants' Rights Under the Crime Victims' Rights Act ("Bonini Decl.") ¶ 8.

[30]  *See id.*

[31]  *See id.* ¶ 9.

[32]  *See id.*

[33]  *See id.*  Haji Hamad, also known as Sami Jasim Muhammad al-Jaburi, is believed to have served as the equivalent of ISIL's finance minister.  *See* U.S. Dep't of Treasury, Office of Foreign Assets Control, Sanctions Actions Pursuant to Executive Orders 13224, *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl0188.aspx.

[34]  Bonini Decl. ¶ 9.

[35]  *See id.* ¶ 10.  In the Bonini Declaration, Inas is identified as Mary Roe IV and Ms. Saleh is identified as Mary Roe V.

[36]  *See id.*

[37]  *See id.* ¶ 12.

[38]  *See id.* ¶ 13.

behavior to instigate a physical attack.[39]  On one occasion, the Defendant took a loaded gun, put it in Mary Roe's hand and called for her husband.  When he arrived, the Defendant falsely claimed that Mary Roe had tried to kill her.  In response, Abu Sayyaf brutally beat Mary Roe while the Defendant watched them.[40]

### B.    Mary Roe II And Mary Roe III

Mary Roes II and III are cousins who are Iraqi nationals and members of the Yazidi faith. Mary Roes II and III were 15 and 13 years old, respectively, when they were abducted by ISIL in August 2014.[41]  They were transferred to a series of detention centers in Iraq for Yazidi women enslaved as *sabaya*.[42]  In or around November 2014, Mary Roes II and III were transferred to the Defendant and her husband's custody, together with Mary Roe II's younger sister and Mary Roe III's older sister.[43]

Mary Roes II and III and their sisters were forcibly confined in one of the Sayyaf residences as slaves.[44]  They were typically locked in a room, forced to perform domestic labor, not given sufficient food, and subjected to emotional abuse and physical neglect either at the hands of, or instigated by, the Defendant.[45]  In addition, they were also forced to witness fellow Yazidi captives, including Inas, being emotionally and physically abused by the Defendant and her husband.[46]  Mary Roe II recalls at least one occasion on which Mary Roe III's sister was beaten with a stick by the Defendant's husband in front of the other Yazidi captives.[47]

---

[39]  *See id.*
[40]  *See id.*
[41]  *See id.* ¶ 15.
[42]  *See id.*
[43]  *See id.* ¶ 16.
[44]  *See id.* Inas was already detained at that location when they arrived. *See id.*
[45]  *See id.* ¶¶ 17–18.
[46]  *See id.* ¶¶ 18, 21–22. *See infra* pp. 9-11.
[47]  *See id.* ¶ 17.

8

When Mary Roe III asked the Defendant why ISIL treated the Yazidis in this way, she said it is because the Yazidis are infidels, they deserve it, and ISIL is right to treat the Yazidis in this manner.[48]

### C.    Nasima Avdo Saleh And Inas Alias Hussein

Nasima Avdo Saleh is an Iraqi national and member of the Yazidi faith.[49] Ms. Saleh was 38 years old when ISIL militants abducted her and four of her children in early August 2014 during an attack in Sinjar.[50] Ms. Saleh had five children, the oldest being Inas Alias Hussein, who was 15 years old when ISIL militants abducted her.[51] After initially being held captive with her mother, Inas was separated from her and taken to Syria by ISIL fighters.[52] Ms. Saleh has not seen or spoken to her daughter Inas since she last saw her in 2014.[53]

Mary Roes II, III, and VI witnessed the abuse committed by the Defendant and her husband against Inas. They report that the Defendant and her husband held Inas at various residences from in or around the fall of 2014 until May 2015.[54] With the Defendant's knowledge and assistance, Inas was subjected to sexual violence by the Defendant's husband, Abu Sayyaf.[55] On at least one occasion, the Defendant prepared Inas to be raped by Abu Sayyaf.[56] The Defendant forced Inas to shower and gave her lingerie and perfume to wear in preparation for the rape.[57] Inas also told Mary Roe III that she had been given a contraceptive by the Defendant or her husband.[58] During

---

[48] *See id.* ¶ 19.

[49] *See id.* ¶ 24.

[50] *See id.*

[51] *See id.*

[52] *See id.*

[53] *See id.*

[54] *See id.* ¶¶ 10, 16, 20; Declaration of Natia Navrouzov in Support of Motion to Enforce Movants' Rights Under the Crime Victims' Rights Act ("Navrouzov Decl.") ¶ 6.

[55] *See* Bonini Decl. ¶ 22; Navrouzov Decl. ¶¶ 14–15.

[56] *See* Navrouzov Decl. ¶ 15.

[57] *See id.*

[58] *See* Bonini Decl. ¶ 22.

these rapes, Mary Roes III and VI could hear Inas's screams from another room.[59] Mary Roe VI states that on at least one occasion, Inas emerged unable to walk, and at one point she was unable to speak or bend her legs for over a month.[60]

The Defendant also forced Inas to perform domestic labor, subjected her to degrading treatment, and beat her.[61] The Defendant's husband would also beat Inas at the Defendant's instigation.[62] At one point, Inas had been beaten so badly that she told Mary Roe II she wished to commit suicide.[63] The Defendant and her husband also did not give Inas sufficient food.[64] According to Mary Roe, in May 2015, Inas was handed over to another senior ISIL official, Haji Hamad, in exchange for Mary Roe.[65]

Ms. Saleh does not know Inas's fate. She and her family received information that, as of late 2020, Inas was alive and continuing to be held captive by ISIL militants.[66]

### D.    Mary Roe VI

Mary Roe VI is an Iraqi national and member of the Yazidi faith.[67] She was 16 years old when ISIL militants abducted her and members of her family on August 3, 2014 from their village.[68] Mary Roe VI was transferred through a series of detention centers in Iraq for Yazidi women enslaved as a *sabaya*.[69]

---

[59]  *See id.*; Navrouzov Decl. ¶ 14.
[60]  *See* Navrouzov Decl. ¶ 14.
[61]  *See* Bonini Decl. ¶¶ 21–22.
[62]  *See* Bonini Decl. ¶ 22; *see also* Navrouzov Decl. ¶ 16.
[63]  *See* Bonini Decl. ¶ 22.
[64]  *See* Navrouzov Decl. ¶ 7.
[65]  *See* Bonini Decl. ¶ 10.
[66]  *See* Navrouzov Decl. ¶ 22.
[67]  *See id.* ¶ 4.
[68]  *See id.*
[69]  *See id.*

In the fall of 2014, Mary Roe VI was taken to a house in Syria.[70] The Defendant's husband was among a group of high-level ISIL leaders and ministers who inspected the captive Yazidi girls to take those they liked.[71] Ultimately, the Defendant's husband took Mary Roe VI and Inas, among other victims, to his and the Defendant's house in Al-Shaddadi, Syria.[72]

At the Sayyaf house, Mary Roe VI was forcibly confined by the Defendant and her husband as a slave.[73] Mary Roe VI was held by the Defendant and her husband Abu Sayyaf for approximately eight months.[74] During this time, she was held with other Yazidi captives, including Inas, as well as Kayla Mueller.[75] Mary Roe VI and other captives were first held in a separate apartment than that of the Defendant and her husband.[76] After relocating to a different house, all of the captives were held in one room in the same house.[77]

For most of the time, Mary Roe VI and the other captives had their hands tied together and some of them also had their legs bound together.[78] All were kept in a locked room to which the Defendant kept the keys.[79] When Abu Sayyaf was away from the house, the Defendant would guard Mary Roe VI and the other captives and send him photos of them.[80] She did not give Mary Roe VI sufficient food or water, and sometimes reduced the amount of food or water as a punishment.[81] The Defendant also played a central role in religious indoctrination, forcing Mary

---

[70] *See id.* ¶ 5.
[71] *See id.*
[72] *See id.*
[73] *See id.* ¶ 7.
[74] *See id.* ¶ 6.
[75] *See id.*
[76] *See id.*
[77] *See id.*
[78] *See id.* ¶ 7.
[79] *See id.* ¶¶ 6–7.
[80] *See id.* ¶ 8.
[81] *See id.* ¶ 7.

Roe VI and her fellow captives to pray, recite verses from the Quran, and cover themselves.[82] If they made mistakes in their religious studies and practice, the Defendant would report it to her husband, thereby instigating a beating by her husband as the Defendant watched.[83]

The Defendant informed Mary Roe VI that she would be raped by many people while staying at the Sayyaf house.[84] Multiple times, the Defendant actively aided in the rape of Mary Roe VI by a man named "Haji," who the Defendant said had purchased Mary Roe VI.[85] The Defendant "prepared" Mary Roe VI to be raped: she told Mary Roe VI what to wear, watched Haji physically inspect her, forced her to shower and remove her body hair, applied perfume and makeup on her, and brought her to the rooms where Haji raped her.[86] After each rape, the Defendant was waiting outside the door when Mary Roe VI was allowed to leave.[87] After one of the rapes, Haji asked Mary Roe VI whether she had had her period. Mary Roe VI told him she had not.[88] Soon after this interaction, the Defendant forced Mary Roe VI to take medication against her will. Mary Roe VI did not know what the medication was but felt powerless to refuse the Defendant.[89]

## III. THE DEFENDANT'S ARREST AND THE MOVANTS' ATTEMPTS TO EXERCISE THEIR CVRA RIGHTS

On or about May 15, 2015, U.S. Armed Forces captured the Defendant at her home and rescued Mary Roe from captivity.[90] Mary Roes II, III, V and VI were no longer the Defendant's captives at that time. The Defendant's husband, Abu Sayyaf, was killed during the course of the

---

[82] See id. ¶ 16.
[83] See id.
[84] See id. ¶ 9.
[85] See id. ¶¶ 10–13.
[86] See id. ¶¶ 11–12.
[87] See id.
[88] See id. ¶ 13.
[89] See id.
[90] Heaney Aff. ¶ 13.

12

operation.[91]  On August 6, 2015, the Defendant was transferred from U.S. custody to Kurdish Regional Government ("KRG") custody.[92]

On February 8, 2016, the U.S. Attorney's Office for the Eastern District of Virginia filed a criminal complaint (the "Complaint") against the Defendant for knowingly conspiring to provide material support to a foreign terrorist organization.[93]  The Affidavit accompanying the criminal complaint states that U.S. officials "expect [the Defendant] to be brought to and found in the Eastern District of Virginia"[94] and the accompanying Department of Justice press release suggests that the Department will "work with the [Iraqi] authorities . . . to pursue our shared goal of holding Sayyaf accountable for her crimes."[95]  However, the Movants are unaware of any action that has been taken to that end.  The United States Government has not interviewed the five Movants.  Indeed, prosecutors have refused to share (or even, possibly, to procure) substantive information about the trial and the Defendant's current status in Iraq.  Moreover, prosecutors have yet to adequately explain why they are not pursuing the Defendant's transfer to the United States to stand trial on appropriate charges.

---

[91]  *Id.*

[92]  Press Release, Dep't of Def., *Defense Department Announces the Transfer of Umm Sayyaf*, Aug. 6, 2015 (NR-322-15), *available at* https://dod.defense.gov/News/News-Releases/News-Release-View/Article/612827/defense-department-announces-the-transfer-of-umm-sayyaf/; Dep't of Justice, *Wife of Dead ISIL Leader Charged in Death of Kayla Jean Mueller*, Feb. 8, 2016, *available at* https://www.justice.gov/usao-edva/pr/wife-dead-isil-leader-charged-death-kayla-jean-mueller.

[93]  Dkt. 1.

[94]  Heaney Aff. ¶ 1.

[95]  Dep't of Justice, *Wife of Dead ISIL Leader Charged in Death of Kayla Jean Mueller*, Feb. 8, 2016, *available at* https://www.justice.gov/usao-edva/pr/wife-dead-isil-leader-charged-death-kayla-jean-mueller.

13

Following consultations with U.S. and KRG officials in 2017,[96] the Movants were told that a court in the Kurdistan Region of Iraq had convicted the Defendant of a crime related to ISIL membership; however, officials did not identify the specific charges underlying the conviction and provided no information about the conduct to which they pertained.[97] To the best of the Movants' knowledge, the Defendant was **not** charged by KRG authorities with the abduction of any of the Movants, their enslavement, or their subjection to sexual abuse and physical violence.[98] Upon information and belief, the Kurdish court heard no evidence concerning the Defendant's role in ISIL's genocidal campaign against the Yazidis, including those crimes named in the Complaint in this case.[99] The Defendant's Yazidi captives, including the Movants, were neither witnesses nor observers of this trial—they did not even know it was happening.[100] Upon information and belief, the Defendant currently remains in KRG custody, although the Movants' counsel has received conflicting information regarding the length of the Defendant's sentence.[101] No official written indictment, transcript or judgment has ever been made available to the Movants, despite assurances from the United States Government, as well as the KRG regional authorities, that such documents are available and would be forthcoming.

On February 7, 2017, the Movants' counsel wrote to the Assistant U.S. Attorney (the "AUSA") to inform him that they represent victims of the Defendant's crimes, as defined under the CVRA.[102] The Movants' counsel requested an opportunity to confer with the AUSA and

---

[96] *See* Declaration of Daniel McLaughlin in Support of Motion to Enforce Movants' Rights Under the Crime Victims' Rights Act ("McLaughlin Decl.") Ex. B.

[97] *See* McLaughlin Decl. Ex. C.

[98] *See* McLaughlin Decl. Ex. B.

[99] *See id.*

[100] *See id.*

[101] *See* McLaughlin Decl. ¶¶ 7, 10, Ex. E.

[102] *See* McLaughlin Decl. Ex. A. At the time, Counsel for Movants represented Mary Roe and Jane Doe. Counsel for Movants was subsequently retained by Mary Roe II, Mary Roe III and

14

requested that the Government recognize the Movants as "crime victims."[103]  On March 1, 2017, the Movants' counsel met with the AUSA and other representatives from the Department of Justice.[104]  At this meeting, Government officials indicated that they did not intend to seek the Defendant's extradition or transfer to the U.S. because they believed a request would not be granted by the Iraqi government.[105]  Moreover, they refused to take a final position regarding the Movants' status as crime victims.[106]

On May 11, 2018, the Movants' counsel sent a letter with substantial supporting material to the AUSA demonstrating why the Defendant's extradition or transfer to the United States was both warranted and not precluded under Iraqi law.[107]  The Movants explained that KRG courts have previously permitted the extradition of Iraqi nationals to another jurisdiction,[108] and noted examples of transfers of Iraqi citizens that had been made under *ad hoc* arrangements between the United States and Iraqi security forces, including the Defendant's transfer from U.S. to KRG custody.  The Movants reiterated that the Defendant's prosecution in the United States presents the only opportunity for the Movants to seek justice for the abuses committed against them by ISIL.[109]  The Movants therefore requested that the Department of Justice pursue the Defendant's extradition after making any necessary amendments to the Complaint to satisfy the rule of

---

Ms. Saleh (on behalf of her daughter Inas), which was communicated to the Government in the February 12, 2019.  McLaughlin Decl. Ex. C. Counsel for Movants now also represents Mary Roe VI.

[103] *See* McLaughlin Decl. Ex. A.
[104] *See* McLaughlin Decl. Ex. B.
[105] *See* McLaughlin Decl. ¶ 4.
[106] *See id.*
[107] *See* McLaughlin Decl. Ex. B.
[108] *See id.*
[109] *See id.*

15

specialty, and again requested an opportunity to confer with the AUSA.[110] The Movants received no response from the AUSA, or any other Government representative, to this letter.[111]

Approximately a year later, on February 12, 2019, the Movants' counsel sent the AUSA another letter seeking information about the status of the case against the Defendant.[112] On March 19, 2019, the Movants' counsel met with the AUSA and other Department of Justice representatives.[113] At this meeting, the Government officials indicated that they did not intend to seek the Defendant's extradition or transfer because, *inter alia*, they understood—but could provide no proof—that the Defendant was serving a life sentence in the KRG.[114] Moreover, they continued to refuse to take a final position regarding the Movants' status as "crime victims."[115] However, the Government officials indicated that they agreed in principle to share with the Movants: (1) any information regarding the proceedings against the Defendant in the KRG, including the charges, evidence, judgments at trial and on appeal, the details regarding the sentence and the possibility of parole, early release or potential inclusion in a prisoner swap; (2) any information regarding her Yazidi captives or Kayla Mueller which was obtained from interviews with the Defendant; and (3) information about current detention conditions.[116] This has not happened.

The Movants' counsel followed up by email on March 27, 2019 and requested an update on the status of this information by May 1, 2019.[117] Having not received a response by May 1, the

---

[110] *See id.*
[111] *See* McLaughlin Decl. Ex. C.
[112] *See id.*
[113] *See* McLaughlin Decl. ¶ 7.
[114] *See id.*
[115] *See id.*
[116] *See id.*, McLaughlin Decl. Ex. D.
[117] *See* McLaughlin Decl. ¶ 8, Ex. D.

16

Movants' counsel followed up by email on May 6, 2019, May 20, 2019, and May 31, 2019.[118] Although the AUSA indicated on June 9, 2019 that the Department of Justice would provide additional information to the Movants as soon as they obtained it, the Movants have not received any further information from the Government to date.[119]

## ARGUMENT

The Movants respectfully request that the Court order the Government to recognize them as crime victims under the CVRA because they were directly and proximately harmed by the Defendant's crimes. In addition, the Movants respectfully request that the Court order the Government to provide them with all information necessary to effectuate their rights under the CVRA, including detailed information about: (1) the Defendant's charges, trial, conviction, sentence and detention by the KRG; (2) the conduct of the trial, including the evidence that was presented, and the conduct that formed the basis of the allegations and conviction; (3) the location and conditions of the Defendant's current detention, including any potential for the Defendant's early release, prisoner-exchange deal, or escape; (4) the circumstances of the Defendant's transfer from U.S. to KRG custody in 2015, including any understandings or agreements relating to the Defendant; and (5) any efforts that the Government has taken, or is planning to take, if any, to extradite or transfer the Defendant to the United States to face charges.

## IV.    THE MOVANTS ARE VICTIMS UNDER THE CVRA

### A.    The CVRA Defines "Crime Victim" Broadly

The CVRA protects the rights of crime victims and assures them meaningful access to the criminal justice process. *United States v. Moussaoui*, 483 F.3d 220, 234 (4th Cir. 2007). The statute defines "crime victim" as any "person directly and proximately harmed as a result of the

---

[118] *See* McLaughlin Decl. ¶¶ 9–10, Ex. E.
[119] *See* McLaughlin Decl. ¶ 10.

17

commission of a Federal offense." 18 U.S.C. § 3771(e); *see also* FED. R. CRIM. P. § 1(b)(12) (adopting same definition). The definition is intentionally broad because Congress wanted to "correct, not continue, the legacy of the poor treatment of crime victims in the criminal process." *See* 108 CONG. REC. S4260, at 4269 (daily ed. Apr. 22, 2004) (statement of Sens. Feinstein and Kyl); *see also United States v. Hunter*, 2008 WL 53125, at *2 (D. Utah June 3, 2008) (noting that the CVRA's sponsors expected an expansive definition of the term).

The Fourth Circuit has not yet set a standard for how to determine if an individual qualifies as a "crime victim," but several courts follow the two-step approach established by the Eleventh Circuit in *In re Stewart*, 552 F.3d 1285 (11th Cir. 2009). *See, e.g., In re McNulty*, 597 F.3d 344, 351 (6th Cir. 2010) (following *Stewart*); *United States v. Giraldo-Serna*, 118 F. Supp. 3d 377, 382 (D.D.C. 2015) (same). "[F]irst, we identify the behavior constituting 'commission of a Federal offense.' Second, we identify the direct and proximate effects of that behavior on parties other than the United States." *Stewart*, 552 F.3d at 1288. *Stewart* also recognized that "[t]he CVRA . . . does not limit the class of crime victims to those whose identity constitutes an element of the offense or who happen to be identified in the charging document. The statute, rather, instructs the district court to look at the offense itself only to determine the harmful effects the offense has on parties." *Id.* at 1289; *see also In re Henriquez*, 2015 WL 10692637, at *1 (D.C. Cir. Oct. 16, 2015) (noting "it is clear that Congress intended courts to look beyond the four corners of an indictment or plea agreement" to determine victim status).

As the Department of Justice's guidelines make clear, "crime victim" in the CVRA includes both U.S. nationals and foreign nationals residing outside the United States. U.S. Dep't of Justice, Attorney General Guidelines for Victim and Witness Assistance, at 12, (2011 ed., rev. May 2012); *see also In re Henriquez*, 2015 WL 10692637, at *1; *United States v. Giraldo-Serna*,

18

No. 1:04-cr-00114-RBW, Order, Dkt. 541 (D.D.C. Mar. 14, 2016) (recognizing Colombian nationals as proper CVRA victims post-remand). Moreover, because a person can claim victim status under the CVRA even before an indictment is filed, victims necessarily can assert CVRA status for factually supported, chargeable offenses—at least until a conviction or acquittal is entered for those offenses. *See In re Henriquez*, 2015 WL 10692637, at *1; *see also* 18 U.S.C. § 3771(d)(3) (making clear that CVRA status may be asserted before the prosecution is underway).

**B.      The Movants Were Directly And Proximately Harmed By The Alleged Conspiracy To Provide Material Support To ISIL And Are Crime Victims**

The Movants—women kidnapped, enslaved, raped, and physically abused by the Defendant or as a result of her direct support[120]—would qualify as victims of those crimes under **any** standard, and easily qualify for CVRA "crime victim" status under the two-step *Stewart* test. The actions comprising the Defendant's charged offense (*i.e.*, providing material support to ISIL) directly and proximately harmed the Movants, who suffered—and continue to suffer—the effects of the Defendant's crimes.

**i.       The Defendant's Conspiracy To Provide Material Support To A Foreign Terrorist Organization**

Section 2339B of Title 18 criminalizes "knowingly provid[ing] material support or resources to a foreign terrorist organization, or attempt[ing] or conspir[ing] to do so." 18 U.S.C. § 2339B(a)(1). The term "material support" includes "any property, tangible or intangible, or service, including . . . lodging, . . . safehouses, . . . [and] personnel." *Id.* § 2339A; *see also United States v. Goba*, 220 F. Supp. 2d 182, 194 (W.D.N.Y. 2002) ("[O]ne can be found to have 'provided material support or resources to a foreign terrorist organization' by offering one's services to said

---

[120] With the exception of Ms. Saleh, who is the mother of victim Inas.

organization and allowing one's self to be indoctrinated and trained as a 'resource' in that organization's beliefs and activities.").

Here, the Defendant is alleged to have conspired to provide material support in the form of services and personnel to ISIL, a designated Foreign Terrorist Organization.[121]   Among the services she provided were maintaining custody over the captives in her home and actively participating in their abuse by senior members of ISIL.[122]   According to the United States Government, she has admitted that the captives in her home were held by her and her husband on behalf of ISIL, and that her residence was used to store firearms for use by ISIL fighters as well as large sums of money that ISIL acquired through illegal activities.[123]

**ii.     The Movants Suffered Severe Physical And Emotional Harm As A Direct And Proximate Result Of The Defendant's Acts In Furtherance Of The Alleged Conspiracy**

The actions underlying the conspiracy charge against the Defendant directly and proximately caused the Movants severe physical and/or emotional harm.   Under the CVRA, a person is directly harmed when the offense is a but-for cause of the harm.   *In re Antrobus*, 519 F.3d 1123, 1126–27 (10th Cir. 2008) (Tymkovich, J., concurring); *United States v. Warwick*, 2011 WL 4527285, at *2 (D. Md. Sept. 26, 2011).   "The 'direct' harm element 'requires that the harm to the victim be *closely related* to the conduct inherent to the offense, *rather than merely tangentially linked.*'" *United States v. Credit Suisse AG*, 2014 WL 5026739, at *4 (E.D. Va. Sept. 29, 2014) (quoting *In re McNulty*, 597 F.3d at 352).   Where, as here, a conspiracy is alleged, the issue becomes whether the victim was harmed by "criminal conduct in the course of the conspiracy

---

[121]   Heaney Aff. ¶ 1.
[122]   *Id.* ¶¶ 9–10; *see also* Bonini Decl. ¶¶ 8–25; Navrouzov Decl. ¶¶ 4–20.
[123]   Heaney Aff. ¶¶ 15–16, 20, 22.

or if the actions taken by defendants . . . which allegedly harmed [the victim] were merely ancillary to the conspiracy." *In re McNulty*, 597 F.3d at 351.

As the Government alleges, the Defendant and her husband forcibly held enslaved individuals at their residence.[124] The Defendant held these Yazidi women, including the Movants, captive and was complicit in their sexual abuse by senior ISIL officials[125] including, *inter alia*, preparing them for rape by dressing the victims in lingerie, applying perfume and makeup, and guarding the doors of those rooms in which the women were raped.[126] The Defendant deprived the Movants of adequate food and water, verbally denigrated them, repeatedly threatened their lives, had her husband beat them, and herself engaged in acts of physical and psychological violence against them in keeping with ISIL's ideology regarding the Yazidis.[127]

The Movants were directly and proximately harmed by this horrific conduct, which was targeted squarely towards them. As a result of the Defendant's actions, the Movants suffered severe physical and emotional harm.[128] These harms would not have occurred but for the Defendant's knowing support of ISIL, including her participation in ISIL's systematic enslavement of women and children and its conspiracy to exterminate the Yazidis. Moreover, it was reasonably foreseeable that subjecting young women and girls to such extreme abuses would result in severe physical and mental suffering. Indeed, their suffering was the Defendant's intended result of her crimes, motivated by ISIL's and the Defendant's ideology and genocidal animus toward the Yazidis.[129]

---

[124] Heaney Aff. ¶ 10; *see also* Bonini Decl. ¶¶ 8–25; Navrouzov Decl. ¶¶ 4–20.
[125] Heaney Aff. ¶¶ 10, 18.
[126] Bonini Decl. ¶¶ 9–22; Navrouzov Decl. ¶¶ 4–20.
[127] Heaney Aff. ¶¶ 10, 12; Bonini Decl. ¶¶ 9–25; Navrouzov Decl. ¶¶ 4–20.
[128] *See* Bonini Decl. ¶¶ 8–26; Navrouzov Decl. ¶¶ 4–20.
[129] *See* Heaney Aff. ¶¶ 10, 12.

The Defendant's crimes also directly harmed Ms. Saleh, who has suffered direct and foreseeable severe emotional harm as a result of the abduction and enslavement of her daughter, Inas.[130] The Defendant subjected Inas to acts of physical, psychological, and sexual violence in the course of the alleged conspiracy. *See United States v. Cummings*, 281 F.3d 1046, 1052 (9th Cir. 2002) (finding that mother of kidnapped child "qualifies as a victim under the [Victim and Witness Protection Act]," which uses the same definition for "victim" as the CVRA (citing 18 U.S.C. § 3663(a)(2))); *In re Mikhel*, 453 F.3d 1137, 1139 n.2 (9th Cir. 2006) ("[T]he family members of the murder victims in this case are themselves victims for the purposes of § 3771.").

Accordingly, all five Movants are "crime victims" within the meaning of the CVRA. 18 U.S.C. § 3771(e)(2)(A). Inas, upon information and belief, has not yet returned from captivity and may be deceased. Her mother and next of kin, Ms. Saleh, assumes Inas's rights under 18 U.S.C. § 3771(e)(2)(B).

## V.   THE GOVERNMENT HAS PREVENTED THE MOVANTS FROM EXERCISING THEIR RIGHTS AS CRIME VICTIMS UNDER THE CVRA

### A.    As Crime Victims, The Movants Are Entitled To Certain Rights Under The CVRA

Critically, as crime victims within the meaning of the CVRA, the CVRA provides the Movants with "[t]he reasonable right to confer with the attorney for the Government in the case." 18 U.S.C. § 3771(a)(5). Moreover, the CVRA provides the Movants with the rights "to be reasonably protected from the accused," "to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused," "to full and timely restitution as provided in law," "to proceedings free from

---

[130] Ms. Saleh is aware of the harm her daughter Inas suffered at the Defendant's residence. She has been informed by other Yazidi captives and by her other daughter who met Inas several times between mid-2015 and 2017 while both were held captive by ISIL militants. *See* Navrouzov Decl. ¶ 22.

22

unreasonable delay," and "to be treated with fairness and with respect for the victim's dignity and privacy." 18 U.S.C. § 3771(a)(1)–(2), (6)–(8).

These rights attach throughout the pendency of the criminal process, including the pre-indictment stage. *See* 18 U.S.C. § 3771(c)(1) & (d)(3) (making clear that CVRA rights attach prior to the prosecution of a crime); *In re Henriquez*, 2015 WL 10692637, at *1 (finding that by its plain language the CVRA applies before formal charges are brought); *In re Dean*, 527 F.3d 391, 394 (5th Cir. 2008) (finding that the right to confer applies before any prosecution is underway); *see also* U.S. Dep't of Justice, Attorney General Guidelines for Victim and Witness Assistance, at 35, (2011 ed., rev. 2012) ("Department officers and employees engaged in the detection, investigation, or prosecution of crime shall make their best efforts to see that crime victims . . . [are] accorded, the rights contained in the CVRA (18 U.S.C. § 3771(c)(1)) as early in the criminal justice process as is feasible and appropriate.").

**B.      The United States Government Has Failed To Provide The Movants With The Information Necessary To Effectuate Their Rights**

The Movants have sought various categories of information from the Government in order to be able to fully effectuate their rights under the CVRA, including information about: (1) the Defendant's charges, trial, conviction, sentence and detention by the KRG; (2) the conduct of the trial, including the evidence that was presented, and the conduct that formed the basis of the allegations and conviction; (3) the location and conditions of the Defendant's current detention, including any potential for the Defendant's early release, prisoner-exchange deal, or escape; (4) the circumstances of the Defendant's transfer from U.S. to KRG custody in 2015, including any understandings or agreements relating to the Defendant; and (5) any efforts that the Government has taken, or is planning to take, if any, to extradite or transfer the Defendant to the United States to face charges.

23

Despite repeated requests, the Movants have been unable to obtain from the Government (or directly from the Kurdish authorities) any detailed information concerning the categories of information enumerated above.[131] While Government representatives assured the Movants that the Government would exercise its best efforts to obtain this information in March 2019,[132] to date, the Movants have not received **any** information from the Government—or even an update about the Government's attempts to obtain the information.[133] In addition, the Movants have sought to provide the Government with evidence in their possession potentially establishing additional chargeable offenses arising out of the Defendant's conduct, but the Government has expressed no interest in this information.[134]

The Government's failure to provide the enumerated information has prevented the Movants from determining the full extent to which their rights under the CVRA have been violated. Although the Movants understand that the Defendant may have been convicted of membership in a terrorist organization in proceedings in the KRG, the Movants were not involved in these proceedings and do not have any details regarding the specific charges or evidence submitted.[135] Based on information provided by Iraqi officials directly to Movants' counsel, the Movants understand that the Defendant was **not** charged in connection with the abduction, enslavement, torture or sexual abuse of any captives, including the Movants themselves.[136] Moreover, it appears that the Government's information is unreliable. While the Department of Justice represented to the Movants that transfer from Iraqi to U.S. custody was impossible given the Defendant's Iraqi

---

[131] *See* McLaughlin Decl. Exs. A, B, C, D, E.
[132] *See* McLaughlin Decl. ¶ 7.
[133] McLaughlin Decl. Exs. D, E.
[134] McLaughlin Decl. Exs. A, B, C.
[135] McLaughlin Decl. Exs. A, B, C.
[136] McLaughlin Decl. Ex. B.

citizenship, the Movants' May 11, 2018 letter demonstrated why this premise was false by analyzing judicial precedent from KRG courts and noting that: (1) domestic law requires Iraq to comply with its international law obligations, including the obligation to extradite the Defendant, if she could not be prosecuted domestically, for the crimes of genocide, hostage-taking, and enslavement and trafficking under Iraqi law; (2) due process conditions in U.S. courts satisfied the protective purpose that underpinned the non-surrender provisions in the Constitution of Iraq and the Iraqi Code of Criminal Procedure; and (3) the Defendant had forfeited non-surrender protection by committing serious crimes outside of Iraqi territory including against a U.S. national.[137] The recent transfer of two "Beatles" ISIL members from Iraq to the United States to stand trial further demonstrates that: (1) it is in the national interest to prosecute ISIL members in U.S. courts; and (2) the United States is able to coordinate the transfer of prisoners in similar circumstances.[138]

The Movants are entitled to the information requested because it is necessary to allow them to exercise their rights under the CVRA and, thus, seek justice for the totality of harms they suffered at the hands of the Defendant. *See United States v. Ingrassia*, 2005 WL 2875220, at *17 n.11 (E.D.N.Y. 2005) ("To the extent victims might wish to *obtain* information on which to base their input, the contemplated mechanism for doing so was conferral with the prosecutor."). The Government has failed to provide the Movants with the basic information necessary to assess the full extent to which their CVRA rights have been violated. *See Does v. U.S.*, 817 F. Supp. 2d 1337, 1344 (S.D. Fla. 2011) (exercising the court's "inherent authority" to permit crime victims

---

[137] *See* McLaughlin Decl. ¶¶ 4–7, Ex. B.

[138] Dep't of Justice, *ISIS Militants Charged With Deaths Of Americans In Syria*, Oct. 7, 2020, *available at* https://www.justice.gov/opa/pr/isis-militants-charged-deaths-americans-syria; Indictment, *United States v. Alexanda Amon Kotey and El Shafee Elsheikh*, No. 1:20-cr-000239-TSE (E.D. Va. 2020), *available at* https://www.justice.gov/opa/press-release/file/1325721/download.

"the opportunity to conduct limited discovery in the form of document requests and requests for admissions from the U.S. Attorney's Office" for the purpose of "factual development" of "possible violations of their rights under the CVRA").

For example, it is possible the Government has violated the Movants' right to confer with the attorney for the Government in this case and to be informed of proceedings amounting to the disposition of the Defendant's case. *See* 18 U.S.C. § 3771(a)(2), (5). The Defendant's transfer from U.S. to KRG custody was a significant event that, subject to the terms of that transfer, may have been tantamount to the disposition of the case. In such circumstances, the Government should have notified and conferred with the Movants prior to this disposition. *See Doe 1 v. United States*, 359 F. Supp. 3d 1201, 1220 (S.D. Fla. 2019) ("[V]ictims should be notified of significant events resulting in resolution of their case without a trial."); *United States v. Heaton*, 458 F. Supp. 2d 1273 (D. Utah 2006) (The right to confer is "not limited to particular proceedings" but is "expansive" and applies broadly to "any critical stage or disposition of the case"); *Doe v. United States*, 950 F. Supp. 2d 1262, 1267 (S.D. Fla. 2013) (the CVRA authorizes "the rescission or 're-opening' of a prosecutorial agreement-including a non-prosecution agreement-reached in violation of a prosecutor's conferral obligations under the statute"). The Government did not confer with the Movants before making a decision that was potentially tantamount to the disposition of the case, nor have they provided the Movants with information regarding the circumstances of the Defendant's transfer from U.S. to KRG custody.

Moreover, it is possible that the Movants' right to be reasonably protected from the accused has been violated, subject to the location and conditions of the Defendant's detention. *See* 18 U.S.C. § 3771(a)(1). Because the Movants have not been informed whether the Defendant is expected to serve the entire sentence in custody—or even whether the Defendant is still in

26

custody—they are unable to assess the threat that she poses to them today. Public reporting also contradicts some of the basic facts provided by the Government regarding the length of Defendant's sentence. In the case of the "Beatles" cell, the Government extradited ISIL members to the United States to face charges before this very Court. The Government's decision to seek their extraditions appears at least partially based on concerns about regional forces' ability to detain them securely, a concern that is shared by the Movants with respect to the Defendant in this case.[139] The Movants are entitled, at the least, to receive an explanation from the Government as to why a different conclusion was reached about the security of Defendant's continued detention by the KRG. *See* 18 U.S.C. § 3771(a)(5).

Finally, the information requested above will demonstrate whether the Movants' rights "to full and timely restitution as provided in law," "to proceedings free from unreasonable delay," and "to be treated with fairness and with respect for the victim's dignity and privacy" have been violated. *See* 18 U.S.C. § 3771(a)(6)–(8).

## CONCLUSION

For the foregoing reasons, the Movants respectfully request that the Court issue an order recognizing the Movants as crime victims under the CVRA and requiring the Government to

---

[139] *See* Ellen Nakashima et al., *U.S. military is taking custody of two British men accused of involvement in Islamic State killings of American hostages*, WASH. POST, Oct. 11, 2019, *available at* https://www.washingtonpost.com/national-security/us-military-is-taking-custody-of-two-british-men-accused-of-involvement-in-islamic-state-killings-of-american-hostages/2019/10/09/a5d8971a-e946-11e9-9c6d-436a0df4f31d_story.html. It has been reported that in October 2019, hundreds of prisoners escaped from detention facilities in Syria, and according to U.S. officials, "the United States had failed to transfer five dozen [other] 'high value' Islamic State detainees out of the country" before then. Ben Hubbard et al., *Abandoned by U.S. in Syria, Kurds Find New Ally in American Foe*, N.Y. TIMES, Oct. 13, 2019, *available at* https://www.nytimes.com/2019/10/13/world/middleeast/syria-turkey-invasion-isis.html. *See also* Miriam Berger, *Here's what we know about the ISIS prisons controlled by the Syrian Kurds*, WASH. POST, Oct. 14, 2019, *available at* https://www.washingtonpost.com/world/2019/10/12/inside-isis-prisons-controlled-by-syrian-kurds/.

27

provide them with all information necessary to effectuate their rights under the CVRA, including information about: (1) the Defendant's charges, trial, conviction, sentence and detention by the KRG; (2) the conduct of the trial, including the evidence that was presented, and the conduct that formed the basis of the allegations and conviction; (3) the location and conditions of the Defendant's current detention, including any potential for the Defendant's early release, prisoner-exchange deal, or escape; (4) the circumstances of the Defendant's transfer from U.S. to KRG custody in 2015, including any understandings or agreements relating to the Defendant; and (5) any efforts that the Government has taken, or is planning to take, if any, to extradite or transfer the Defendant to the United States to face charges.

Dated: April 22, 2021            By: _Katherine M. Davis_____

Katherine Maddox Davis (VSB 89104)
Cate Harding (pro hac vice *application forthcoming*)
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Phone: (202) 955-8587
Fax: (202) 831-6038
kdavis@gibsondunn.com
charding@gibsondunn.com

Zainab N. Ahmad
Charline O. Yim
Marryum A. Kahloon
    *Motions for* pro hac vice *admission filed herewith*
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Phone: (212) 351-2609
Fax: (212) 817-9500
zahmad@gibsondunn.com
cyim@gibsondunn.com
mkahloon@gibsondunn.com

28

Daniel McLaughlin
Elzbieta T. Matthews
Carmen K. Cheung
    *Motions for* pro hac vice *admission filed herewith*
Center for Justice & Accountability
One Hallidie Plaza, Suite 750
San Francisco, CA 94102
Phone: (415) 544-0444
Fax: (415) 544-0456
dmlaughlin@cja.org
ematthews@cja.org
ccheung@cja.org

Amal Clooney
    *Motion for* pro hac vice *admission filed herewith*
53-54 Doughty Street
London, WC1N 2LS
UNITED KINGDOM
Phone: +4402074741313
lal@doughtystreet.co.uk

*Counsel for Movants Mary Roe, Mary Roe II, Mary Roe III, Nasima Avdo Saleh and Mary Roe VI*

29