# EXHIBIT B

**THE CENTER FOR JUSTICE & ACCOUNTABILITY**
Bringing Human Rights Abusers To Justice.

**doughty street chambers**

SCOTT A. GILMORE
Staff Attorney
One Hallidie Plaza, Suite 406
San Francisco, CA, USA 94102
+1 510 374 9872
sgilmore@cja.org

AMAL CLOONEY
Barrister and Attorney
53-54 Doughty Street
London WC1N 2LS
+44 020 7474 1313
personalasst@icloud.com

May 11, 2018

*Via email*

Dennis M. Fitzpatrick
Office of the United States Attorney
Eastern District of Virginia
2100 Jamieson Ave
Alexandria, VA 22314

       Re:    *Extradition of Nisreen Assad Ibrahim Bahar (a.k.a. "Umm Sayyaf")*

Dear Mr. Fitzpatrick:

We write to you on behalf of our respective clients under the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, in the matter of *U.S. v. Bahar*, No. 1:16-mj-00063-MSN (E.D.Va.).

As explained in our letter of February 7, 2017, and at our meeting on March 1, 2017, our clients wish to see Umm Sayyaf tried for her role in the abuses they endured. These abuses include hostage-taking, enslavement, sexual abuse, and beatings. We have learned from Iraqi officials that this conduct was never addressed—through charges or evidence—in the limited proceedings against Umm Sayyaf in Iraq, which focused solely on her membership in ISIL. The case opened by your office is thus the only vehicle to hold Umm Sayyaf to account for these crimes.

For this reason, and in light of new information that has emerged, we urge you to re-examine the possibility of seeking the extradition or transfer of Umm Sayyaf. Since our last meeting, we have obtained judicial records from Iraq and the U.K. (appended to this letter), which offer a precedent for extraditing Iraqi nationals to foreign jurisdictions for crimes committed outside of Iraqi territory. Contrary to initial reports, the Iraqi constitution is not an absolute bar to the extradition of Iraqi nationals such as Umm Sayyaf. Accordingly, we respectfully submit that Umm Sayyaf's extradition or transfer can and should be sought as soon as possible, for the reasons stated below.

## I.    Extradition is warranted

Justice has not been served in Iraq. As you know, Umm Sayyaf is in the custody of the Kurdish Regional Government ("KRG"). Through communications with KRG and U.S. officials, we have learned that in or around the spring of 2016, a KRG court convicted Umm Sayyaf of membership in a terrorist organization. Court personnel informed us that she was not charged in connection with the abduction of our clients, their reduction to slavery, nor their subjection to sexual abuse and physical violence. According to our sources, the KRG court heard no evidence of Umm Sayyaf's role in the

hostage-taking of Kayla Mueller or her role in ISIL's genocidal project against the Yazidis, including the victims identified in your Complaint. The victims were neither witnesses nor observers of the trial – they did not even have the privilege of knowing that it was taking place.

Prosecution in the United States therefore offers a unique opportunity to do justice. Nowhere in the world has a suspect been tried for ISIL's horrific abuse of hostages. Nor has a single suspect been tried in connection with ISIL's campaign of violence against the Yazidis — a campaign recognized by the U.S. government as genocide.[1] To our knowledge, Umm Sayyaf is the first suspect captured by the anti-ISIL coalition who could be charged with respect to the treatment of an American hostage in addition to Yazidi victims. Her extradition and trial would send a powerful message to condemn and deter atrocities carried out under ISIL's black banner, and beyond.

## II.     Iraqi Law Does not Preclude the Extradition or Transfer of Umm Sayyaf

Umm Sayyaf could be brought to the U.S. through formal extradition or *ad hoc* transfer. Below, we examine why Iraqi law would permit either option.

## A.     Legal Framework for Extradition or Transfer

Upon information and belief, Umm Sayyaf is a citizen of Iraq and is currently located in the Kurdistan Region of Iraq ("KRI"). The U.S. and Iraq maintain a bilateral extradition treaty, signed in 1934,[2] and still in force.[3] This treaty imposes on each party an obligation to deliver to the other any persons charged or convicted of a range of listed crimes. Included are several offences of which Umm Sayyaf is suspected and with which she could be charged, such as perpetrating or acting as an accessory to rape, kidnapping, and crimes punishable by the laws for the suppression of slavery and slave trading.[4]

In addition to the U.S.-Iraq extradition treaty, U.S. and Iraqi security forces have previously made *ad hoc* arrangements for the transfer of suspects. Indeed, Umm Sayyaf was apparently transferred from U.S. to KRG custody through such a channel. Accordingly, Umm Sayyaf's presence in the U.S. could be obtained either through the treaty or a constitutionally viable alternative to extradition.[5]

It has been argued that Iraqi law would preclude any surrender of Umm Sayyaf to U.S. custody. Article 21 of the Iraqi Constitution stipulates that "[n]o Iraqi shall be surrendered to foreign entities and

---

[1]   U.S. Secretary of State John Kerry, "Remarks on Daesh and Genocide," Mar. 17, 2016, https://www.state.gov/secretary/remarks/2016/03/254782.htm.

[2]   Extradition Treaty between the Kingdom of Iraq and the Republic of the United States of America, concluded on June 7, 1934, 49 Stat. 3380 (Apr. 23, 1936) **(Annex 1)**.

[3]   In 2014, Iraq extradited a dual US-Turkish national accused of fraud to the US under that treaty. See US Department of Justice Press Release, *Iraq Extradites Fugitive Defense Contractor to U.S. to Face Fraud Charges*, July 28, 2014 (available at: https://www.justice.gov/opa/pr/iraq-extradites-fugitive-defense-contractor-us-face-fraud-charges).

[4]   Extradition Treaty between the Kingdom of Iraq and the Republic of the United States of America, concluded on June 7, 1934 **(Annex 1)**, Article II.

[5]   *Cf. United States v. Alvarez-Machain*, 504 U.S. 655, 668–69 (1992) (holding that U.S.-Mexico extradition treaty was not the exclusive means of obtaining the presence of a defendant from a foreign jurisdiction).

authorities." And Article 358(4) of the Code of Criminal Procedure provides that "[e]xtradition is not permitted . . . if the person requested is of Iraqi nationality." We shall refer to these collectively as the "non-surrender provisions." However, an examination of Iraqi jurisprudence and executive decisions reveals that extradition is legally possible as the non-surrender provisions have been construed by Iraqi courts as derogable under certain circumstances.

## B.      A Precedent for Extraditing Iraqi Nationals: the *Ali* and *Agha* Decisions

In a series of judgments issued in 2009 and 2010, the Sulaimaniya Felonies Court in the KRI granted the extradition of two Iraqi nationals to the U.K.[6] The *Ali* and *Agha* cases arose from the "honor killing" of Banaz Mahmod, an Iraqi Kurdish woman living in the U.K., whose family had opposed her relationship with a man.[7] Ms. Mahmod was murdered in London in January 2006, and two of her cousins, the Iraqi nationals Mohammed Salih Ali and Omar Hassan Hama Agha, were among the five family members implicated in her death. They fled to Iraq in the weeks following the murder to escape prosecution,[8] and both were subject to arrest warrants and requests for extradition by the U.K.

Mr. Ali resurfaced some time later in the KRI, having been apprehended and convicted for a traffic offense. He was brought to the Sulaimaniya Felonies Court, which, on June 25, 2009, ruled in favor of the U.K.'s request for his extradition.[9] Mr. Agha was apprehended some months later, and the request for his extradition was granted by a differently constituted bench of the Sulaimaniya Felonies Court on March 10, 2010.[10]

In both cases, the defendants raised Article 21 of the Iraqi Constitution and Article 358(4) of the Code of Criminal Procedure as a bar to extradition. And in both cases, the courts rejected the defense for three reasons.

Firstly, the Sulaimaniya Felonies Court reasoned in both *Ali* and *Agha* that the non-surrender provisions must harmonize with other provisions in Iraq's Constitution and Code, which require Iraq to meet its international obligations:

---

[6] Sulaimaniya Felonies Court, *Re Extradition of Mohammed Saleh Ali* (Case no. 1/R/2009), June 25, 2009 (**Annex 2**) and Sulaimaniya Felonies Court, *Re Extradition of Omar Hassan Hama Agha* (Case no. 3/R/2009), March 10, 2010 (**Annex 3**). We received these court records from the Common Serjeant of the Central Criminal Court in London (part of Her Majesty's Courts & Tribunals Service) on 8 September 2017. The office of the Common Serjeant also provided us with the decision adopted by the Minster of Justice of the Kurdistan Regional Government ("KRG") dated 28 June 2009 to authorize the extradition of Mohammed Saleh Ali (**Annex 4**). Should your office have any questions concerning the provenance or acquisition of these records, we would be pleased to provide copies of our correspondence with the Common Serjeant.

[7] *R v Mohamed Ali & Omar Hussain* [2011] EWCA Crim 1653 (**Annex 5**), ¶1.

[8] *R v Mohamed Ali & Omar Hussain* [2011] EWCA Crim 1653 (**Annex 5**), ¶2.

[9] Sulaimaniya Felonies Court, *Re Extradition of Mohammed Saleh Ali* (Case no. 1/R/2009), June 25, 2009 (**Annex 2**) (hereinafter "*Ali Decision*").

[10] Sulaimaniya Felonies Court, *Re Extradition of Omar Hassan Hama Agha* (Case no. 3/R/2009), March 10, 2010 (**Annex 3**) (hereinafter "*Agha Decision*").

> *"Article 8 of the Constitution requires Iraqi nationals to fulfill their international obligations and Article 352 of the Code of Criminal Procedure stipulates compliance with the provisions of international treaties and conventions and the rules of general international law."*[11]

The court found a potential conflict between the non-surrender provisions and the 1932 Iraq-U.K. extradition treaty, which commits each party to surrender persons accused or convicted of felonies listed in the treaty, including those for which Ali and Agha had been charged in the U.K.[12] This conflict could, in appropriate cases such as this one, be resolved in favor of extradition.

Secondly, the court reasoned that the purpose of the non-surrender provisions was to protect Iraqi nationals from violations of due process in foreign judicial systems, but it was satisfied with the protections available in the British justice system.[13]

Finally, the court concluded that the defendants had forfeited their rights to non-surrender by (a) leaving Iraq illegally, (b) committing a crime of murder outside of Iraq, and (c) thereafter returning illegally to Iraq.[14] For those reasons, the court ruled that extradition to the U.K. was permissible, a determination upheld by the KRG Ministry of Justice.[15]

## C.    Applying *Ali* and *Agha*: Grounds for the Extradition or Transfer of Umm Sayyaf

This precedent provides three grounds for the extradition or transfer of Umm Sayyaf to the United States.

### 1.    Iraq's International Obligations and Commitments Counter-Balance the Non-Surrender Provisions

The non-surrender provisions must be read to conform with Iraq's international obligations. In this instance, *Ali* and *Agha* suggest that the U.S.-Iraq extradition treaty will likely be considered a factor

---

[11] Sulaimaniya Felonies Court, *Re Extradition of Mohammed Saleh Ali* (Case no. 1/R/2009), June 25, 2009 (**Annex 2**); *accord* Sulaimaniya Felonies Court, *Re Extradition of Omar Hassan Hama Agha* (Case no. 3/R/2009), March 10, 2010 (**Annex 3**). Article 8 of the Iraqi Constitution stipulates: "Iraq shall observe the principles of a good neighborliness, adhere to the principle of non-interference in the internal affairs of other states, endeavor to settle disputes by peaceful means, establish relations on the basis of mutual interests and reciprocity, and respect its international obligations"; and Article 352 of the Code of Criminal Procedure reads: "In requests from foreign countries for legal assistance and in the extradition of accused and sentenced persons the instructions stipulated in this chapter will be followed in consultation with the regulations of international treaties and agreements and the principles of international law and the principle of reciprocity."

[12] Extradition Treaty between His Majesty, in respect of the United Kingdom, and His Majesty the King of Iraq, concluded on May 2, 1932 (**Annex 6**), Article 3.

[13] *Ali Decision* (**Annex 2**) at 4; *Agha Decision* (**Annex 3**) at 2 (noting "the high esteem in which the British legal system is held, its international reputation and administration of justice and the absence of any misgivings as to the accused's rights and his ability to defend himself by such legal means as are available to him.").

[14] *Ali Decision* (**Annex 2**) at 4 (noting that the defendant "forfeited his right to be extended jurisdiction and protection under the Iraqi legal system . . ."), *Agha Decision* (**Annex 3**) at 2.

[15] Letter of Faruq Jamil Sadiq, Minister of Justice, Kurdish Regional Government, No. 89, June 28, 2009 (**Annex 4**). The Sulaimaniya Felonies Court's ruling was upheld by the UK Court of Appeal in R *v Mohamed Ali & Omar Hussain* [2011] EWCA Crim 1653 (**Annex 5**).

favoring surrender. Note, that this treaty – just like the U.K.-Iraq extradition treaty discussed in *Ali* and *Agha* – makes it discretionary, rather than obligatory, for either party to extradite its nationals.

The addition of new charges would alter the analysis and impose an international obligation for Iraq to extradite Umm Sayyaf. For example, the Hostages Convention, to which Iraq is a party, makes extradition mandatory.[16] If Umm Sayyaf were charged with hostage taking, either under the Hostage Taking Act, 18 U.S.C. § 1203, or the War Crimes Act, 18 U.S.C. § 2441(d)(1)(I), and extradition were sought, Iraq would be obligated to surrender her. This is because Articles 5 and 6 of the Hostages Convention require Iraq either to (a) prosecute a suspected hostage-taker found in its territory or (b) extradite the suspect to, among others, the hostage's state of nationality. Since hostage-taking is not penalized in Iraqi law, Iraq could not prosecute Umm Sayyaf for this offense and could only comply with the Hostages Convention by acceding to an extradition request.[17] This appears to be precisely the sort of international obligation that would override Iraq's non-surrender provisions under Article 8 of the Iraqi Constitution and Article 352 of the Code of Criminal Procedure.

Similarly, the addition of genocide charges (with respect to the Yazidi victims) would trigger a potential conflict between Iraq's non-surrender provisions and its international commitments. Genocide could be charged as a predicate offense of a material support charge under 18 U.S.C. § 2339(A) or as freestanding offenses under 18 U.S.C. § 1091(a)(2) (for causing "serious bodily injury to members of" a protected ethnic or religious group through sexual violence and physical abuse) or § 1091(a)6) (for "transfer[ring] by force children of the group to another group"). As a party to the Genocide Convention, Iraq is obligated to "prevent and punish" the crime of genocide and to "punish . . . persons committing genocide."[18] Since Iraq has not incorporated the crime of genocide into its penal code, the only means by which it could punish a perpetrator found within its territory would be by extraditing or rendering that individual to another state or international tribunal of competent jurisdiction. And indeed, Article VII of the Genocide Convention commits Iraq to "grant extradition in accordance with [its] laws and treaties in force."[19] The addition of genocide charges would thus be an additional factor overriding the non-surrender provisions.

---

[16] International Convention against the Taking of Hostages, 1979, 1316 UNTS 206, No. 21931, http://treaties.un.org/doc/db/Terrorism/english-18-5.pdf ("Hostages Convention"). Iraq signed the Hostages Convention on October 14, 1980 and ratified on August 26, 2013. *See* https://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=XVIII-5&chapter=18&clang=_en.

[17] In an analogous case concerning the extradite or prosecute provision of the Convention Against Torture, the International Court of Justice ruled that a state on whose territory a person suspected of torture is found is required either to submit the case to its competent authorities for prosecution or grant a request for extradition. *Questions relating to the Obligation to Prosecute or Extradite (Belgium v. Senegal)*, ICJ Reports 2012, paras 75–77. Since the Hostages Convention contains a virtually identical provision on the obligation to prosecute or extradite, this

[18] Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9 1948, S. Exec. Doc. O, 81-1 (1949), 78 U.N.T.S. 277. Iraq ratified the Genocide Convention on Jan. 20, 1959. *See* https://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg_no=IV-1&chapter=4&clang=_en

[19] *Id.*

Slavery or trafficking charges would also create an obligation to extradite. If Umm Sayyaf were to be charged with Chapter 77 trafficking-related offenses,[20] the UN Convention against Transnational Organized Crime, to which Iraq is a party,[21] would trigger Iraqi international commitments. Under Article 16, "serious crime[s],"[22] such as those imputed to Umm Sayyaf, are deemed extraditable offenses, so long as they are punishable under both States' domestic laws.[23] The supplemental Trafficking Protocol, to which Iraq is also a party,[24] extends this obligation specifically to human trafficking offenses.[25] And, most importantly, Article 10 of the Trafficking Protocol provides that a State Party who does not extradite perpetrators "solely on the ground that he or she is one of its nationals, shall, at the request of the State Party seeking extradition, be obliged to submit the case without undue delay to its competent authorities for the purpose of prosecution." Thus, were Iraq to receive an extradition request and refuse it on nationality grounds, it would be obligated to reopen the case against Umm Sayyaf on slavery and trafficking charges. Under *Ali* and *Agha*, these international obligations must be taken into account and should indeed override the non-surrender provisions.

2.     **American Due Process Satisfies the Protective Purpose of the Non-Surrender Provisions**

The second factor weighed in *Agha* and *Ali* would also counsel in favor of extraditing Umm Sayyaf. As the Sulaimaniya Felonies Court noted, the non-surrender provisions are intended to protect against "unsafe" foreign legal systems. Like the U.K., the U.S. clearly is not an unsafe system: Umm Sayyaf would receive all the due process protections guaranteed to criminal defendants by the US Constitution. Accordingly, the protective purpose of the non-surrender provisions would be met, just as they were in *Agha* and *Ali*.

---

[20] Several Chapter 77 slavery and trafficking offenses appear *prima facie* chargeable. *E.g.*, 18 U.S.C. § 1584 (making it unlawful to hold a person in a condition of slavery by force or threats of force); 18 U.S.C. § 1590 (making it unlawful to, *inter alia*, harbor or broker persons for labor or services). Under 18 U.S.C. § 1596(a)(2), jurisdiction would lie as Umm Sayyaf is expected to be brought into and found in the Eastern District of Virginia.

[21] Convention against Transnational Organized Crime, Nov. 15, 2000, 2225 U.N.T.S. 209. Iraq accession on March 17, 2008. *See* https://www.unodc.org/documents/treaties/UNTOC/Publications/TOC%20Convention/TOCebook-e.pdf.

[22] Article 2(b) defines a "serious crime" as "conduct constituting an offence punishable by a maximum deprivation of liberty of at least four years or a more serious penalty."

[23] Convention against Transnational Organized Crime, Nov. 15, 2000, 2225 U.N.T.S. 209, Article 16. Iraq's accession notes that the Central Committee to Prevent Human Trafficking within the Ministry of Interior would undertake the goals of the convention.

[24] Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, 2000, 2237 U.N.T.S. 319. Iraq accession on February 9, 2009.

[25] Trafficking in persons is defined as: the recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation. Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, 2000, 2237 U.N.T.S. 319, Article 3 (a).

### 3. Umm Sayyaf has Forfeited Non-Surrender Protection by Committing Crimes Outside of Iraqi Territory and Against a U.S. National

Finally, just as the *Ali* and *Agha* defendants were found to forfeit their protection against surrender by committing crimes outside of Iraqi territory, Umm Sayyaf has forfeited this right by committing crimes in Syria against non-Iraqi nationals including Kayla Mueller, a national of the United States. Under these circumstances, Umm Sayyaf would not be unfairly prejudiced by being tried by a foreign government when she committed or conspired to commit unlawful acts, beyond Iraq borders, against a U.S. national and Iraqi nationals forcibly trafficked out of Iraq, on behalf of a terrorist group with international reach.

For these reasons, the U.S. has a sound legal basis to seek Umm Sayyaf's extradition or transfer from Iraq. Iraq's non-surrender provisions would not apply here, just as they did not apply in *Agha* and *Ali*.

## III. Double Jeopardy is No Bar to Extradition or Transfer

As your office is well aware, the Double Jeopardy Clause—the Fifth Amendment's prohibition against successive prosecutions for the same offense—does not extend to prosecutions by different sovereigns: "under what is known as the dual-sovereignty doctrine, a single act gives rise to distinct offenses—and thus may subject a person to successive prosecutions—if it violates the laws of separate sovereigns."[26] Further, the Double Jeopardy Clause does not preclude successive prosecutions based on different acts or transactions or for different offenses, each of which requires proof of additional facts which the other does not.[27] Since there is no doubt that the U.S. and Iraq are "separate sovereigns," and since the potential case before U.S. courts would deal with separate acts and different offenses, the Fifth Amendment would not bar prosecuting Umm Sayyaf in the U.S. Nor does the U.S.-Iraq Extradition Treaty contain a *non bis in idem* provision that would bar extradition on this basis.

## IV. To Satisfy the Rule of Specialty, Any Additional Charges Would Need to Precede an Extradition Request

The U.S.-Iraq extradition treaty contains a limitation requiring consideration before any request is made. Article IV reflects the rule of specialty, providing in pertinent part that "[n]o person surrendered shall be tried for any crime other than that for which he was surrendered without the consent of the surrendering High Contracting Party . . ."[28] Federal courts recognize and enforce the rule of specialty as a bar to trying an extradited defendant for any crime other than "the offense with which he is charged in the proceedings for his extradition."[29] For this reason, caution dictates that any additional charges would need to be included in an amended charging instrument before seeking extradition. Such charges would not only be in the interest of justice, they would also bolster the case for extradition. As discussed above, charges under the Hostage Taking, War Crimes, or Genocide statutes – which

---

[26] *Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1867 (2016).

[27] *Blockburger v. United States*, 284 U.S. 299, 304 (1932); *Grady v. Corbin*, 495 U.S. 508 (1990).

[28] Extradition Treaty between the Kingdom of Iraq and the Republic of the United States of America, concluded on June 7, 1934 (**Annex 1**), Article IV.

[29] *United States v. Rauscher*, 119 U.S. 407, 430 (1886); *United States v. Day*, 700 F.3d 713, 722 (4th Cir. 2012).

better reflect the full extent of Umm Sayyaf's criminality than the current charges – would trigger international obligations and commitments that Iraq could only satisfy by surrendering Umm Sayyaf to the U.S.

## V.     Conclusion

Umm Sayyaf was never tried for the abuses that she and her co-conspirators inflicted on our clients. To the best of our knowledge, the proceedings in Iraq were narrowly focused on her membership in ISIL and did not include evidence of Umm Sayyaf's participation in the enslavement, sexual abuse, or beatings of our clients.

The sole means to hold Umm Sayyaf accountable for these specific crimes is the criminal case opened by your office. Based on the record from the Iraqi and U.K. courts, it is now clear that the extradition or *ad hoc* transfer of Umm Sayyaf to the U.S. is permitted by Iraqi and international law. Indeed, should such a request be made, it would likely be granted based on legal precedent and the circumstances of the Umm Sayyaf case. We believe that trying Umm Sayyaf for these crimes in an American court is in the interest of justice and indeed the only way for justice to be served.

We therefore respectfully urge your office to seek extradition following any necessary amendments to the charging documents.

We would appreciate the opportunity to discuss these issues further at your convenience. We stand ready to assist and look forward to ensuring a successful outcome for our clients. Thank you in advance for your time and consideration in this matter.

Sincerely yours,

Scott A. Gilmore

Counsel for Mary Roe, and
Carl and Marsha Mueller

D.C. Bar # 1002190

Amal Clooney

Counsel for Mary Roe

N.Y. Bar # 4081055

## ANNEXES

**Annex 1:**    Extradition Treaty between the Kingdom of Iraq and the Republic of the United States of America, concluded on June 7, 1934, 49 Stat 3380.

**Annex 2:**    Sulaimaniya Felonies Court, *Re Extradition of Mohammed Saleh Ali* (Case no. 1/R/2009), June 25, 2009.

**Annex 3:**    Sulaimaniya Felonies Court, *Re Extradition of Omar Hassan Hama Agha* (Case no. 3/R/2009), March 10, 2010.

**Annex 4:**    Minster of Justice of the Kurdistan Regional Government ("KRG") dated June 28, 2009 to authorize the extradition of Mohammed Saleh Ali.

**Annex 5:**    Judgment of the English Court of Appeal (Criminal Division) in *R v Mohammed Ali & Omar Hussain* [2011] EWCA Crim 1653 dated June 21, 2011.

**Annex 6:**    Extradition Treaty between His Majesty, in respect of the United Kingdom, and His Majesty the King of Iraq, concluded on May 2, 1932.