UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

UNITED STATES OF AMERICA,          :
                                   :
              Plaintiff,           :   Criminal Action
                                   :   No. 1:16-mj-63
         v.                        :
                                   :
NISREEN ASSAD IBRAHIM BAHAR,       :   October 15, 2021
                                   :   10:02 a.m.
                                   :
              Defendant.           :
                                   :
.............................  :
                                   :


**TRANSCRIPT OF MOTION HEARING PROCEEDINGS
BEFORE THE HONORABLE THERESA C. BUCHANAN,
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE**

APPEARANCES:

For the Plaintiff:          **Dennis Fitzpatrick, Assistant U.S.
                            Attorney**
                            United States Attorney's Office
                            2100 Jamieson Ave
                            Alexandria, VA 22314
                            (703) 299-3954
                            Email:
                            Dennis.fitzpatrick@usdoj.gov

                            **Aidan Taft Grano-Mickelsen,
                            Assistant U.S. Attorney**
                            United States  Attorney's Office
                            2100 Jamieson Avenue
                            Alexandria, VA 22314
                            703-299-3700
                            Email: Aidan.grano@usdoj.gov

For the Movants:            **Zainab Ahmad, Esq.**
                            Gibson Dunn & Crutcher LLP (NY-NA)
                            200 Park Avenue
                            New York, NY 10166-0193
                            212-351-4000
                            Fax: 212-817-9500
                            Email: Zahmad@gibsondunn.com

APPEARANCES:   (Cont.)

For the Movants:              **Caitlin Harding, Esq.**
                             (By Telephone)
                             Gibson Dunn & Crutcher LLP (DC-NA)
                             1050 Connecticut Ave, NW
                             Washington, DC 20036-5306
                             202-955-8500
                             Fax: 202-530-4233

                             **Marryum Afzal Kahloon, Esq.**
                             Gibson Dunn & Crutcher LLP (NY-NA)
                             200 Park Avenue
                             New York, NY 10166-0193
                             212-351-4000
                             Fax: 212-716-0867
                             Email: Mkhaloon@gibsondunn.com

                             **Charline Oh Yim, Esq.**
                             Gibson Dunn & Crutcher LLP (NY-NA)
                             200 Park Avenue
                             New York, NY 10166-0193
                             212-351-4000
                             Fax: 212-351-4035
                             Email: Cylm@gibsondunn.com

                             **Amal Clooney, Esq.**
                             (By Telephone)
                             Doughty Street Chambers
                             (NA/London)
                             53-54 Doughty St
                             London, WC1N 2LS United Kingdom
                             Email: Nr@amalclooney.co.uk

 Court Reporter:             **Scott L. Wallace, RDR, RMR, CRR**
                             Official Court Reporter
                             United States District Court
                             401 Courthouse Square
                             Alexandria, VA  2231-5798
                             Office: 703.549.4626
                             Cell: 202.277.3739
                             Email: Scottwallace.edva@gmail.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

**MORNING SESSION, OCTOBER 15, 2021**

(10:02 a.m.)

THE COURTROOM CLERK:  *United States versus Nisreen Ibrahim Bahar* and *United States versus Mary Roe*, 16-mj-63.

Would counsel on the phone please identify themselves for the record.

MS. HARDING:  Cate Harding with Gibson Dunn on behalf of movants.

MR. FITZPATRICK:  Good morning, Your Honor.  Dennis Fitzpatrick and Aidan Grano-Mickelsen on behalf of the United States.

MS. AHMAD:  Good morning, Your Honor.  Zainab Ahmad on behalf of the victims Mary Roe and Nisreen Bahar.  Thank you.

THE COURT:  And do we have other counsel on the phone as well?  I just want to make sure we identify all counsel.

MS. AHMAD:  I believe we may have Ms. Amal Clooney [sic] joining us, as well as co-counsel for the Center for Justice and Accountability, but I would ask them to let us know.

THE COURT:  All right.  If there are any other counsel on the phone, please identify yourselves for the record.

MS. MATTHEWS:  Hi.  Yes, this is Ela Matthews with The Center for Justice and Accountability.

THE COURT:  All right.  And is there any other counsel here with you?

MS. AHMAD:  Yes, Your Honor.  I'm joined by my co-counsel

4

Marryum Kahloon, Charline Yim and Caitlin Harding.

THE COURT:  All right.  Thank you.

MS. AHMAD:  Thank you.

THE COURT:  All right.  This is on the movants' motion to enforce their rights under the Crime Victims Rights Act.

I've read all the pleadings.  Did you have anything to add to your motion?

MS. AHMAD:  I did, Your Honor, just briefly.  As Your Honor knows, we represent five women who were victims of genocide and were, alongside an American woman, sexually enslaved and brutally tortured by the defendant in this case.

Despite these undisputed facts, for many years the Department of Justice refused to acknowledge that our clients were victims under the Crime Victims Rights Act, and it took the filing of this motion, I believe three to four years after we had initially raised the question with DOJ, to finally resolve that issue.

And, in response to our brief, the government has conceded that our clients are victims under the statute, which we believe is obviously the only legally viable position here, but that history is crucial for framing the issues that remain in dispute here, and those are that the government does not believe that, in the context of this case, our clients are actually statutorily entitled to anything as a result of their status as CVRA victims.

And the particular unique circumstances of the case that

the government relies on in arguing that it is relieved of its obligations under the statute are the fact that the defendant is currently in foreign custody.  So it bears some emphasis as to the conditions that caused this situation to occur.

So, firstly, the defendant was arrested by the United States.  There was an ongoing federal criminal proceeding at that time -- an investigation, I should say, not proceeding.  The FBI interviewed the defendant when she was in U.S. custody.  The government made the decision on its own to transfer her to Iraqi custody.  The victims in this case were not consulted with about that decision, even though courts have held in similar and parallel circumstances that precharging decisions that are incredibly consequential are ones that victims should be made aware of and consulted with respect to, but the government did not consult with the victims and transferred the defendant to Iraqi custody.  The government now takes the position that the fact that she is in Iraqi custody means she can never be extradited to the U.S.

We don't agree with that for two reasons:  One, there's never been any proof submitted that the defendant is an Iraqi citizen.  Her husband was Tunisian.  The DOJ has told us that they simply have no basis to believe she has other citizenship; but they couldn't give us any affirmative evidence of her Iraqi citizenship.

Second, we're aware of some examples of defendant being

extradited from Iraq.  But putting that aside, because that's not central here, it shows that from the government's view the result of its actions of transferring the defendant to Iraq means that she could never face justice in an American court for her crimes because of their interpretation of Iraqi law.

And the government then proceeded to announce that it was supporting and participating in that prosecution, as we said, by then Assistant Attorney General John Carlin in a Press release accompanying the unsealing of the charges in this case.

And that's the final point, which is that the government, after turning the defendant over to the Iraqi authorities, made the decision to charge her in Federal Court in the United States. And those -- even if there could be a situation where DOJ turning a defendant over to a foreign tribunal after a federal criminal investigation could relieve them of their statutory obligations with respect to victims, it certainly can't be true when they also filed a parallel criminal action in this court, which is what brings us to this court today.

And for those reasons, we believe that our clients are statutorily entitled to what we are seeking from the government. So, firstly, that is information about the proceedings against her in Iraq, information about the conditions of her detention, and the government has given us some of this information -- several months after we initiated the process of seeking it -- but not very much.  There's two and a half pages that are

excerpts of court documents.  We don't have the original court documents.  Those two and a half pages beg more questions than they answer.

THE COURT:  Well, let me ask you this question:  Has that information been redacted or is that, to your understanding, the extent of what the government has been able to obtain from the Iraqi government?

MS. AHMAD:  I don't know, Your Honor.  It was provided to us in the form of a letter from the AUSA to myself, and some of the words are those of the author and then there are some excerpts of Iraq court materials.  So I don't know whether the government has more Iraqi court materials, whether it has the originals of those, or what, in fact, the government is excerpting in having written that letter.

THE COURT:  How would you -- I mean, just hypothetically, how would you extend the CVRA to a foreign prosecution in that this is not something that the government has direct control of?  I understand that you seek this information, and I understand that the government has represented that they are trying to obtain this information for you -- what they have obtained they have turned over to you, but if we're not dealing with redactions, and I will address that separately, then, to me -- and correct me so I understand how you see this -- the government is necessarily, to some degree, hampered in its ability to provide this to you because they can give you what they can get

from the Iraqi government.

MS. AHMAD: Yes, Your Honor. So, I'll answer that in two ways. With respect to the information about the proceedings that are in the hands of the Iraqi government, we don't know what the government has asked or what effort they have made to get that information. So while I would agree that ultimately they could only get what they could get, I think that would vary depending on the nature of the interaction and exchange, which has been opaque to us.

Again, we met with the government -- my co-counsel met with the government over the course of several years before we filed this motion, and at each of those meetings we asked the government to provide us with this information, and they promised that they would and then didn't. And it took the filing of this motion to start whatever the process is that the government went through to get that information.

THE COURT: Well, it seems to me that the government is voluntarily providing the information that it has represented that it will try to obtain or has obtained, but I'm having a hard time seeing how the CVRA extends to a foreign prosecution. It certainly extends to the complaint filed in this case, but -- and then if that ever starts -- if the defendant is ever extradited and if those proceedings ever start towards trial, that's a different matter. I'm having a hard time understanding how the CVRA would extend to a foreign prosecution.

MS. AHMAD:  So, one example, Your Honor, if we go back to the decision to turn the defendant over to the Iraqi authorities, at that point there's no foreign prosecution, there is only an American federal criminal investigation.

THE COURT:  Right.

MS. AHMAD:  And the government makes the very consequential decision to turn her over to a foreign tribunal rather than hold her accountable for her crimes in the United States.

THE COURT:  Right.

MS. AHMAD:  That is akin to the sort of precharging decisions that courts have held victims should be able to confer with the government about, so --

THE COURT:  Well, the government -- I mean, the government has given you its rationale; whether you like it or not, or whether you think it's, perhaps, complete enough, but when I read the CVRA, most of it deals with your right to be informed.  It involves your right to be reasonably heard at a public proceeding -- there has not been one -- but then the only one that I see under this number 5 would be the one that would give you the most rights, so to speak, and it says, "the reasonable right to confer with an attorney for the government in this case."  It doesn't say that you have the right to be in the decision-making process, though.

So, the government has given you -- and they stated in

their pleadings -- their rationale for not proceeding with extradition, for not proceeding with the prosecution in the United States, and for turning the defendant over to Iraqi authorities.  So what more do you think you have a right to than that information?

MS. AHMAD:  So, Your Honor, we had a right to be conferred with at the time the government made that decision.

THE COURT:  How do you see that?  What under the CVRA do you think that is --

MS. AHMAD:  If you look at United -- I'm sorry, Dean -- *"In re: Dean"* 527 F.3d 391, this is a case where the government had reached a settlement agreement with BP in the BP Oil Spill case, and the government asked the District Court ex parte to excuse it from its victim notification requirements that it agreed applied before they entered into a plea agreement with BP.

THE COURT:  Well, that's different.  That would fall under number 9, which is the right to be informed in a timely manner of any plea bargain or deferred prosecution.

But, again, we're talking about informed, not a voice.

MS. AHMAD:  Yes, Your Honor, but in the *Dean* case, the language that you just cited, number 9, was added in the 2015 amendment.  And actually, in the *Epstein* case -- I'll find the cite in a moment -- the victim -- the government there argued that that right had to be limited to plea agreements because that's what it said in 9, but --

THE COURT:  -- or deferred prosecution.

MS. AHMAD:  But the Court in *Epstein* found that, in fact, that -- before that provision was added -- the right was very broad to add any consequential decision that would affect the disposition of the entire matter, that victims be given a right to confer and that that provision was not intended to narrow the backdrop that exists.

THE COURT:  I think you're conflating the two bullet points under the CVRA.  Number 5 says just generally the right to reasonably, reasonably confer with the attorney for the government.  The other is if it affects a plea bargain or deferred prosecution, the right to be informed in a timely manner.  So I'm having -- I'm having trouble translating this into what you describe is a seat at the table.

MS. AHMAD:  So, Your Honor, I want to be clear that the seat at the table is not a deciding seat, it is the right to be able to -- the right to confer has been held to be the right to express opinions.  So the right to be asked your opinion and to express it is all that we are suggesting that the statute --

THE COURT:  But haven't you done that?  Haven't you done that?  I mean, they still, hypothetically, would have the option to try to extradite the defendant.  So you have voiced that opinion.  The government has told you why they decided not to do that, so I'm not quite sure what more you think needs to be done.

MS. AHMAD:  So, Your Honor, I think the first part of that

that I'm answering, your question as to what the CVRA can provide victims in this situation, which is that I believe the CVRA provided our clients the rights to, which they were not granted, to confer with the government before that decision was made. That right of theirs was violated, but it existed at the time.

Where there's no foreign proceedings, there's a federal criminal investigation, and it's precharging -- the cases are clear that the CVRA -- a CVRA right exists in that regard.

And, in particular -- I was mentioning the *Epstein* case before, and this is *Doe v. United States,* 359 F. Supp. 3d 1201. There the government made the argument that the provision that you are citing with respect to plea agreements and deferred prosecution agreements is exclusive to those agreements and didn't, for example, apply to the nonprosecution agreement that the government issued -- entered into with Jeffrey Epstein, and the Court rejected that argument saying that, "prior to this amendment, this Court held the right to confer extended to the precharge state of criminal investigations and proceedings," and that "the 2015 amendment does not serve to repeal or restrict the obligations of the government to confer with victims in the early stages of a case."

THE COURT:  Okay.

MS. AHMAD:  So I do believe that the statute grants a broader right for conferral precharging than just what is listed in that line item within the statute, and the pin cite for that

is 1219 to 1220.  And so that is an example of how the CVRA can actually grant rights to victims like our clients in this case, and it also is an example of how our clients' rights were violated in this case.

And so the question now is not why did you do it, but what's our remedy for that?  And we have -- there's case law permitting rescission.  It would obviously be complicated in a case like this, and we haven't asked for that here at this time. We have asked the government to give us more insight into why they made that decision.

We don't want access to classified information.  We don't want any investigative files.  And they have been reluctant to do so.  I don't believe the explanation that they provide in their opposition brief is sufficiently detailed to meet their requirements.  It's not whether or not I credit it or like it, but I think that the victims in this case are entitled to know some of what the thinking was with respect to why this was the better course for the woman who tortured them and that, I think, we still have not obtained from the government.

And then to go back to your initial question about the information about the foreign proceedings, the government can obtain -- imagine that the government can obtain answers to the questions that it asked.  We don't know what questions the government asked to get these records.  We don't know if the government asked for the full record.  Because, if they asked for

the full record and the Iraq government said, no, we'll only give you excerpts, then we're in the situation that Your Honor envisioned.  But if they haven't asked for the full record, then we're not.  Then there's still more information that the government can reasonably obtain and that they've not reasonably obtaining.

And I would direct your attention again to the Press release announcing these charges where the government said we fully support the Iraqi prosecution of Sayyad and will continue to work with the authorities there to pursue our shared goal of holding Sayyad accountable for her crimes.  That language suggests to me a closer relationship than what we have been given to date would lead us to believe exists.  That would suggest to me we're not getting that much because we're not pushing hard enough.

And, understanding that this is statutorily required, we believe may affect that calculus, and that's why it's important to us that we frame this within the context of the CVRA, because situations can also change.  We still don't know, by the way, where Umm Sayyaf has been detained.  Even though our clients live in the same region of the world as this woman, we have not been given information as to where she's detained or whether there are any chances of parole or early release.  And it's -- I believe that the government could attempt from the Iraq government to get that information, to set up some system where, if she was

released, we would be notified, and that's the sort of information that we think they can get, but they haven't.  So, I'll leave it there unless you have any further questions.

THE COURT:  Thank you very much.

MS. AHMAD:  Thank you.

MR. FITZPATRICK:  May it please, Your Honor.

THE COURT:  You may remove your mask if you've been vaccinated.  I'm sorry.  I neglected to say that.  I was having no trouble hearing you, but, if you've been vaccinated, you can remove your mask.

MR. FITZPATRICK:  I have.

THE COURT:  Okay.

MR. FITZPATRICK:  Your Honor, as a threshold matter, the movants should be commended for their advocacy on behalf of the Yazidi community.  On that issue, there is no daylight between the movants and the United States government.  We specifically referenced in our complaint against Bahar the persecution of the Yazidi religious minority in Northern Iraq.  It's a commendable position, and it's a commendable advocacy on behalf of the movants.

However, Your Honor, they go too far in their claims.  As the Court noted in its questioning with Ms. Ahmad, the CVRA does not extend to foreign court proceedings.  As we noted in our pleadings, the *In re: Brown* case analyzed the definition of "court" in the CVRA and very clearly and logically held that by

definitions and other statutory provisions, that the reference to court means a federal judge applying federal positive United States law.  It does not refer to foreign prosecutions.

So, as a threshold matter, the movants don't have any statutory right to access or compel the government to access foreign court proceedings, and that makes just logical, good old fashion common sense.

On top of that, Your Honor, we, however, under our best efforts provisions of the CVRA and our desire to be as forward-leaning as we can in this matter, endeavored to get foreign court information that we were permitted to turn over, and we did that a month ago after going through the approval process.

THE COURT:  So lot me ask this:  Was there information that was redacted or not released to the defendant, substantive information that they're seeking?  Is that in the possession of the government?

MR. FITZPATRICK:  Yes.  This information that we received from the KRG in Northern Iraq is foreign government information. Through time-tested traditional procedures, when governments provide information to one another, they are allowed to place conditions on it.  The conditions on some of the information here go to security and the protection of particular individuals.  The information that we turned over, which I would submit to the Court is very robust, we provided them with -- Contrary to

Ms. Ahmad's assertions, we provided them with granular detail of the charging decisions and of the proceedings. That was permitted information to turn over. The foreign government cleared us to turn over that information.

THE COURT: And did they clear you to turn over and have you turned over whether the KRG proceeding encompassed the defendant's treatment of the movants in this case?

MR. FITZPATRICK: Yes, yes.

THE COURT: And you have not turned that over?

MR. FITZPATRICK: We have turned that over.

THE COURT: Is there anything of that part of it that's been withheld?

MR. FITZPATRICK: There are some confidential -- there are some witnesses who need protection that -- the identity of the witnesses who provided the information are not turned over, but the information that was received by the Court, and the Court and two appellate courts relied upon to affirm a conviction, was turned over.

THE COURT: In their request they asked for evidence presented during the KRG proceeding. Other than the identity of the informants or the witnesses, was that turned over in its entirety?

MR. FITZPATRICK: I'm sorry, Your Honor, one more time.

THE COURT: I'm sorry. They asked -- in one of the bullet points that they asked for is evidence presented during the KRG

proceeding, and expanding just a bit on what you just said, except for the right -- except for the identity of the informants or the witnesses in the case, was the entirety of that evidence that you received turned over to the movants or was there anything of that redacted?

MR. FITZPATRICK:  Not the -- the entirety of the testimony received by the KRG court was not turned over.  However, we turned over very relevant information.  In particular, what the Court noted, when the Court received information that members of the Yazidi community were harmed by the defendant and her conduct and related individuals' conduct, we turned that over.

THE COURT:  And have you been able to receive any information as to the -- not perhaps the location specifically, but the location of the defendant in terms of whether or not she is in Iraq and whether or not she has -- may be released at some point?

MR. FITZPATRICK:  So, Your Honor, we have turned over to the movant that she is serving a life term of imprisonment within an Iraqi detention facility.  We do not have the precise location of that, and nor do I think would a foreign government necessarily turn that precise location over to us.  This is a fraught area of the world, a very dangerous place in the world. I do not think that the foreign government would appreciate us publicly disseminating the location of a convicted ISIS figure in Northern --

THE COURT:  I'm not saying the precise location, but she is and you have told them that she is in a detention or jail facility; is that correct?

MR. FITZPATRICK:  Correct.

THE COURT:  And what about potential release, even though she has a life sentence?

MR. FITZPATRICK:  We have no information on that.  Our -- the information that the government has received is that she is serving a life term of imprisonment, that there have been no further proceedings since her appeals were exhausted in May of 2016, and we're aware of no further proceedings.

I'll tell the Court I am not an expert on, you know, Iraqi parole procedures or, you know, extraordinary relief measures, but we are told that she is serving a life term imprisonment. We're also told that the KRG government takes this matter very seriously.  There is regular communication -- we are going to ensure that there's regular communication between the KRG and U.S. -- United States government personnel in the region. There'll be regular periodic check-ins to check on the status of her incarceration.

If anything like that should come on the docket or if we become aware of that, we will fulfill our responsibilities, but the information we have right now is that she is serving a life term of imprisonment and that there is no effort ahead to reduce that.

THE COURT:  Okay.  You can proceed.  I'm sorry.

MR. FITZPATRICK:  Thank you, Your Honor.  With respect to extradition, Your Honor, these go to, again -- the CVRA was not intended to act as a sword or needle to sort of pierce other well-established functions of the executive branch of government.  These -- this case, Your Honor, rests on highly unique and sensitive facts; unlike, I would submit, any other facts that have come up in the CVRA context.

So, the CVRA does not allow movants and victims to get into the internal deliberations or the international relations of various countries, particularly countries such as the United States and Iraq which reside in a fraught and war torn environment.

These are very sensitive relationships, they're very complicated relationships, and trying to unpack or use the CVRA to get into the dialogue between two countries is inappropriate, inappropriate as a matter of law -- it's unjustified as a matter of law, it's unjustified as a matter of public policy and foreign policy.  So the extradition argument, respectfully, Your Honor, I think falls apart dramatically.

With respect to the conferral issue, when she was transferred in August of 2015, the government acknowledged this, and the Department of Defense stated that her transfer was -- took place and was appropriate for legal intelligence, security, and foreign relations matters.  The precise language is in our

pleading, but that is, in essence, the government's position.

With respect to the conferral requirement, the Court has already noted that the statute at its heart -- the CVRA is a notice and consultation statute.

The language within the statute is replete with "reasonableness" language.  Every provision, nearly every provision in the statute is qualified by "reasonable" or "reasonableness".

Under the unique circumstances of this, a transfer from one country to another of that country's national citizen in, again, a sort of fraught, war torn area, the conferral responsibilities under the CVRA are very, very low, I would submit, on the reasonableness scale when you measure it against the circumstances of this particular transfer.

In addition, Your Honor, the identity, being able to identify at that time -- we're talking about August of 2015 -- a particular victim within the Yazidi community isn't necessarily an easy thing to do, and I don't know if that was -- the contact information for an identifiable victim was readily available. So, I would just offer that for the Court's --

THE COURT:  And that preceded the involvement of these particular movants in terms of their communication with the government or did it not?

MR. FITZPATRICK:  So, it's a little -- what I think -- it's still a little unclear to me.  Of these particular movants

today, I believe one of them may have been known to the government in the 2015 time period.  Again, I have to qualify it by saying it's still a little unclear to me, but I think one may have been known.  The others I do not believe were known to the government.  And with respect to -- and the whole question of who is a victim, who is not a victim -- again, the movants, when they filed the current motion, their petition, essentially, they filed it with much more detail than they had previously in their communications with the government.

Once we read with the, you know, sworn, particularized information regarding who they represent, it was very clear to us that these were victims; in particular in the manner in which we alleged the *Bahar* case.

Again, the U.S. victim in the *Bahar* matter is a young woman from Arizona.  She was held captive by the defendant in this case and others, in particular her husband who is now deceased.

She is the U.S. victim in the case.  The relevance of the Yazidi victims is -- that woman, Kayla Mueller, was her located co-captive with the Yazidi women who can establish the I.D. of the defendant and also the identity of the now deceased U.S. victim.

So, the Yazidi witnesses and the Yazidi plight is very relevant to the Bahar prosecution.

THE COURT:  What information was given or released to you

or any other known victims at the time or publicly in 2015 as to the decision to not extradite and to turn her over to Iraqi forces?

MR. FITZPATRICK:  Your Honor, I wasn't -- the parents of Kayla Jean Muller were notified.  I wasn't privy to all those conversations.  A number of those conversations were held with officials within the National Security Division, but I know that they were notified and were kept apprised of developments in that time period, so I believe that we satisfied, with respect to the U.S. victims, victim's family, I believe we satisfied our obligations at that time.

THE COURT:  And was there any public announcement, notification at that time?

MR. FITZPATRICK:  Yes, Your Honor.  So the government filed its charges in this case in February of 2016.  We did not file it under seal.  We filed it, again, publicly also with commentary by the then -- I believe it was the Assistant Attorney General for the National Security Division.

THE COURT:  Well, in terms of the decision or the turning over of the defendant to the Iraqi forces or the Iraqi government, the KRG, was that made public and was the -- at that time -- and the decision to not extradite, was that made public at that time?

MR. FITZPATRICK:  So, what was made public -- the Department of Defense made that announcement, and it's reflected

in our pleadings, that they were transferring Bahar from Sayef to the Iraqi government.

THE COURT:  Okay.

MR. FITZPATRICK:  And they explained themselves publicly in their announcement.

THE COURT:  All right.

MR. FITZPATRICK:  Your Honor, the decision, again, whether or not to extradite or not to extradite and the thinking that goes into that is quintessential executive privilege --

THE COURT:  I'm wondering more, what information was disseminated at that time?

MR. FITZPATRICK:  Yes, and I think the Court makes a good point, is that the government, given the nature of this case and -- you know, the government has actually been remarkably transparent in this case, and I think that's where the Court is going.  This is not an instance where the Court [sic] is trying to hide the ball.  We announced the transfer of Ms. Bahar to Iraq.  We announced the charges.  We've now provided, I would call it, very substantial detail about the Iraqi prosecution.

So, Your Honor -- and the Court's question raises an issue that the movants raised in their argument regarding the *Epstein* case.  This could not be any further from an Epstein-type of case.

First of all, the government has charged the woman with providing material support to a Yazidi foreign terrorist

organization.  The government has acknowledged that she has been prosecuted in the foreign government, taken her conviction through two levels of appeal, and is serving a life term of imprisonment.

This is not a situation where she was given a sweetheart deal; far from it.  She's serving a life term of imprisonment in Iraq, and the government has charged her.  And, if anything, whether it is a possibility or a remote possibility, if anything changes in her prosecution, we have an active and live charge to pursue.

So, quite frankly, the drawing in of this *Epstein* case is wholly inappropriate under these circumstances.

THE COURT:  All right.

MR. FITZPATRICK:  Your Honor, I think -- hopefully, I have addressed all the Court's concerns.  I can take any further questions.

THE COURT:  I don't have anything further.  Thank you.  Do you have a reply?

MS. AHMAD:  Yes, Your Honor, briefly.

THE COURT:  And you can take your mask off at the podium, if you would like.

MS. AHMAD:  I wanted to address first the *Brown* case that AUSA Fitzpatrick mentioned, because it is completely beside the point to the question of whether or not crime victims can get information about foreign court proceedings.  The provision that

that statute -- that that case was interpreting of the CVRA was the provision that allows victims to pursue writ of mandamus with the Appellate Court, the provision that allows victims to seek writ of mandamus from District Court decisions denying them the relief they sought, and in that instance the relief had been provided by a magistrate court, a magistrate judge, not a district judge, and the defendant argued that's not a District Court. And the Court said, yes, it is, it's a federal officer exercising federal authorities, so you can pursue a writ of mandamus. If that -- the use of the term "District Court" had nothing to do with the Court proceeding, that issue about which victims are entitled to information, so it doesn't bear on the question one way or another.

With respect to the extradition, I would note that Mary Roe, one of our clients in this case, was liberated from the Sayyef compound by U.S. Special Forces, so they were certainly aware of her existence.

And to the extent that -- I heard the government to be saying two things. One is that they didn't have to confer with us, and, second, that they couldn't confer with us because they couldn't reach our victims. If it's the latter, then we should get the information now that they would have given us then. We have gotten three to four sentences. We've heard that, with respect to Ms. Mueller's family, there were several meetings and conversations, and I would assume that they were given more than

27

three to four sentences of explanation.

And so we would still believe that our not getting the information to which we were entitled at that time doesn't mean that we shouldn't get that same exact information today.

And the government does slightly exaggerate what we're looking for to make it seem more ridiculous.  We're not looking for sensitive foreign relations communications.  I was an extraterritorial terrorism prosecutor with DOJ for 11 years, and I know the sort of dialogue that goes back and forth when you're deciding how to handle someone taken into custody abroad, whether to charge them domestically, whether to charge abroad.

THE COURT:  Right, but doesn't that fall under prosecutorial discretion?

MS. AHMAD:  Yes, Your Honor.

THE COURT:  And that is not something that is necessarily or usually discussed with the victim's family in a foreign situation as this, is it?

MS. AHMAD:  Well, so, Your Honor -- yes.  Certainly it was.  I had a case where we were extraditing a defendant from Mali, and they wouldn't turn him over unless we agreed not to pursue the death penalty, and that was an assurance that we felt we could make without consulting with the victim.  So we did --

THE COURT:  Okay.  But all right.  Go ahead.  I'm sorry to interrupt you.

MS. AHMAD:  But with respect to prosecutorial discretion,

I would direct the Court to *In re: Dean* again, 527 F.3d 391 where the Court, in talking about about the observation made by the District Judge, that allowing the notification to be given in this situation would prejudice the government and limit prosecutorial discretion, this Court said, "In making that observation, the Court missed the purpose of the CVRA's right to confer.  In passing the Act, Congress said you have to confer with victims before, in this case, a plea agreement is reached," and then the Court said, "That is not an infringement on the government's independent prosecutorial discretion.  Instead, it is only a requirement that the government confer in some reasonable way with the victims before exercising its broad discretion."

And so I just want to repeat that in no way here are we suggesting that the government -- we were entitled to the government exercising its discretion in one way or another.  We are suggesting that we were entitled to be heard.

And then finally, with respect to the information point --

THE COURT:  Well, how was your -- how would your client -- other than the one client who, perhaps, was known at that time who was not in the United States -- how exactly would they have conferred with your clients when there was really no communication at that point with counsel or anyone representing them, someone who they could confer with?  We're talking about a practical matter.

MS. AHMAD:  No, I understand that.  I think there was one client they could have conferred with, and what we're asking for now is talk us through everything that you would have talked us through then.  We know we cannot change anything that happened, we couldn't have even affected it at the time, but can we please get the same information we would have gotten then now that we're here now, and that I don't believe we have gotten.  I don't think three or four sentences in a letter can match the quality of the information and back and forth that went on in the several in-person --

THE COURT:  Do you -- do you know -- or do you have any information that they gave the Mueller family more information, in fact, than what you have received, substantive information?

MS. AHMAD:  I don't know either way.

THE COURT:  Okay.

MS. AHMAD:  But I'm relying on AUSA Fitzpatrick's description of the quality and quantity of the interactions with the Muller family before charging.

THE COURT:  Okay.

MS. AHMAD:  And the final thing I'll just say is just on the information on the Kurdish proceedings we're seeking.  I certainly don't think it's accurate that the government has been remarkably transparent here in that it issued a Press release about its charges.  I think that's fairly standard.

The history of our requesting this information from the

government begins in February of 2017.  We sent a letter.  In March 2017 AUSA Fitzpatrick and others from the National Security Division met with us, agreed to provide us information and did not.  In May of 2018 we sent another substantive letter seeking additional information and did not hear back.  In February of 2019 we sent another letter seeking a status update and did not -- I'm sorry, then we met with AUSA Fitzpatrick in March 2019.  They agreed to provide any information regarding the proceedings against the defendant in the KRG, including the charges -- everything we're seeking here.  We didn't hear back.  We sent a follow-up e-mail on March 27th, a follow-up e-mail on May 6th, a follow-up e-mail May 20th, May 31st, nothing; June 7th, nothing.  And it goes on until we filed this motion, but it is just to say that this has been a very difficult process, and it has taken our statutory entitlement to this information to obtain it, and it leads me to not have full confidence that we've gotten everything that the Iraqi government would be willing to share, because it has -- it has not felt like the United States government was being very forceful in its request with the Iraqi government to share that information, especially because of this language for some time.

        So when we now have these two and a half pages that are mainly -- the two excerpts from the Court proceeding read as if -- let me say, the defendant is confessing, although one of them references the accused as being Bakr al-Baghdadi, so I'm not

quite sure what proceedings these are from, because they're internally confusing, and she confesses to inflating six Yazidi women. I believe that's all the government is relying on to suggest that she was held accountable for her actions towards our clients. There's no mention of her being convicted of genocide or sexual enslavement or anything along those lines, just general terrorism offenses.

And it's also slightly confusing because the record that he gave us is just her confessing, but then there's a litany of appeals that follow it. I'm not an expert on the Iraqi justice system, but it seems to suggest two different approaches of the defendant to her conviction.

And so there's just a lot of questions that are unanswered, and we believe that the government can get more information and should try to. And if we hit a wall, then we hit a wall. We certainly agree that all we can ask of the government is its best efforts, but we're just not confident that that's what we have gotten, given the history of our engagement with the government on this matter.

THE COURT: All right. Thank you. All right. The movants here have -- are seeking information as to the following: First, whether the charges in the KRG proceeding encompassed the defendant's treatment of the movants, whether the evidence presented during the KRG -- the substantive information of the evidence presented during the KRG proceeding, location,

circumstances, and conditions surrounding the defendant's detention in the KRG and potential release, circumstances of her transfer from U.S. custody to KRG custody, and the rationale behind the government's efforts, or lack thereof, to extradite or prosecute the defendant.

First, let me say that I have the utmost sympathy for the movants as victims in this horrific case, and the government has agreed now that the movants are victims under the CVRA and should be treated as such. The question is, of course, how far their rights extend under the CVRA.

I find that, although the movant victims' claim in their reply that they do not seek the CVRA to be applied extraterritorially, nor do they seek to infringe upon prosecutorial discretion or conduct of U.S. policy, their requests do, in fact, extend to those issues.

Since the prosecution of the defendant is in Iraq or the prosecution that we're speaking of first was in Iraq, I find that the CVRA does not extend to that foreign prosecution. The government represents that it has tried to obtain information that the movants are seeking, as it should, and it has provided the movants with as much information as it's been able to obtain and release with permission. I am relying also on the statements, as an officer of the court, from Mr. Fitzpatrick that they have turned over everything that they can turn over.

The forcefulness of that request and your concern about

that, however, impinges, I believe, on foreign policy issues and the government's -- our government's relationship with KRG.

The government has pledged to try to continue to obtain the information that the movants are requesting, information which is in the hands of the KRG, but to the extent that you seek more, I don't believe that you actually have rights under the CVRA as to the foreign prosecution itself.

To the extent that you seek a table, which is the words which were in your brief, and seek a voice regarding circumstances and a decision to transfer the defendants from U.S. to Iraqi custody and the government's rationale behind it and the rationale behind the decision to extradite or not extradite the defendant, that falls squarely, I believe, within the bounds of U.S. foreign policy and prosecutorial decision -- discretion, excuse me.

The government has given you its rationale for its decisions, and although I understand you're not satisfied with the breadth of their rationale, I believe that, under the CVRA, you have received what you are entitled to receive.

The CVRA is limited in great part to being informed, but it is subject also to reasonableness, especially when it relates to conferring with the government or the government attorney.

I believe that the information that you are receiving or that you have received is the extent of what you are entitled to receive.

However, I would say that I think it is incumbent upon the government, to the extent that they provided more information to the Muller family at the time in their discussions, I think it is incumbent on the government to find out specifically what was given to the Mueller -- I understand, Mr. Fitzpatrick, you were not involved in that at the time, but I think it is incumbent upon the government to go back and look at what specific information was given to the Mueller family -- because you did say you had several conversations with them -- and to the extent that you gave information to them that exceeds the information given to these movants, I think you are obligated to provide that to these movants.

But I cannot find, based on what I have here, that the government has violated your rights under the CVRA. I, therefore, find that the government has reasonably provided the information that the movant victims are entitled to under the CVRA and has fulfilled its obligation under that Act.

The government has vowed to try to provide the movants with the information from the Iraqi prosecution and detention that they can obtain, as they should, and when and if there is, of course, an active prosecution of the defendant in the United States, the movants here would clearly have the right to all of the provisions under the CVRA. But this motion, I believe, must be denied. Thank you.

(Proceedings adjourned at 3:32 p.m.)

**C E R T I F I C A T E**

I, Scott L. Wallace, RDR-CRR, certify that the foregoing transcript of proceedings was prepared from an FTR Gold audio recording of proceedings in the above-entitled matter and was produced to the best of my ability.  Indiscernible indications in the transcript indicate that the audio captured was not clear enough to attest to its accuracy.

/s/ Scott L. Wallace                    10/19/21

------------------------------          -----------------
  **Scott L. Wallace, RDR, CRR**              **Date**
    **Official Court Reporter**